UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

     -against-

DWAYNE STONE,
JAMES McTIER and
SHARIEF RUSSELL,

                Defendant.
------------------------------------------------x

MEMORANDUM AND ORDER
05 CR 401 (ILG)

GLASSER, United States District Judge:

     In a letter dated November 18, 2007. the defendant McTier expressed some objections to the voir dire procedures employed by the Court which were explicated at some length and concluded with a request that the Court reconsider the rulings it made that jurors numbered 74 and 103 were qualified to serve and were not substantially impaired. The concern which prompts the defendant's request may perhaps be best understood if the relevant portion of those voir dires were set out. As to juror #74:

     THE COURT: Let me try and collapse a lot of the questions that were asked in regard to the death penalty and your attitude toward it. This case may proceed in two stages. The first stage is what is referred to as the guilt stage – guilt or innocence state, I guess would be more accurate. At that stage of the trial the government, which has the only burden of proof in this case, the government would seek to discharge the burden of proof, they have to convince the jury beyond a reasonable doubt that the defendants are guilty of the crimes with which they are charged, and after all the evidence is in and you listen to the arguments pro and con

as to guilt or innocence, my instructions as to the law, you will retire with the other members of the jury and spend as much time as you need discussing the case. And assume you come out with a verdict of guilty, if the jury comes out with a verdict of guilty, if the jury comes out with a verdict of not guilty, that would be the end of the matter, but if the jury comes out with the verdict of guilty, then there would be a second stage, the penalty stage. In a case in which the death penalty is one of the alternatives, it is the jury that makes a decision, not the court. So at that second stage you will be hearing evidence from the government of what has been referred to in the questionnaire as aggravating factors, evidence of factors which in the government's view makes the death penalty appropriate, and you will be hearing evidence from the defendant of what has been referred to as mitigating factors, evidence of things, which facts circumstances, which the defendant believes should cause the jury to conclude that the death penalty is not the appropriate sentence to be imposed. And after you've listened to all of the evidence, you listen to the arguments pro and con, you return to the jury room and deliberate about all those things until you've arrived at the verdict. Would you be able to vote in favor of the death penalty if you concluded that that would be the appropriate sentence, given all of the factors in this case?

      PROSPECTIVE JUROR:    Well, if it was an option I would certainly give it strong consideration depending, again, on the evidence presented, and how I felt about it and any mitigating factors that would be

included, certainly, but again, it wouldn't be something I will come to very easily or very lightly.

THE COURT: Well, the option is death penalty or life imprisonment without parole. If the question is if you concluded that the aggravating factors are significantly outweighed by the mitigating factors, or whatever it was or would be, that would cause you to conclude one way or the other, assuming you concluded the death penalty was appropriate, would you be able to vote for it if that was the conclusion which you reach?

PROSPECTIVE JUROR: If I felt in my heart it was justified I could do that, but again, it would depend on the circumstances involved and all other evidence.

THE COURT: Fair enough. Anything else?

MR. HERMAN: Yes. Can I be heard outside the presence of the — can you please excuse the juror? I had additional questions I want to ask.

THE COURT: Okay. Would you just step out for a moment please.

PROSPECTIVE JUROR: Sure.

(Prospective Juror #74 exited the courtroom)

MR. HERMAN: The information that we would like to expand on is question 52B. The potential juror says strong mitigating factors, self-defense. For instance, by and large, self-defense is not a mitigating factor; it is a defense. We would ask that Your Honor simply tell the juror that mitigating factors could be about the defendant, his background, nature of

the offense, that type of thing, so we have some framework on which to make a determination as to whether he could consider those types of mitigating factors, but because it seems to me one could read this to the effect that if it is not self-defense, then he is going to vote for the death penalty and if that's so, then he not qualify.

So I think we need to know could he vote for life without parole for a person who's been convicted of an intentional murder or purposeful murder. That is really our question. I know Your Honor has boiled it down to a single question, but something we need to know is that if they're focused on someone who has been convicted of murder could they, nonetheless, give them life without parole if there were no defenses, no insanity, no self-defense, no accident. That's what we would like to know.

  MR. JONES:  Judge, I'm not sure it is necessary. first of all, I realize self-defense is necessarily a mitigator, but I think in this case it is going to be for one of the murders, at least according to what Mr. McTier told the agents, one of the murders, that he thought his life was in danger. the guy said he would consider all the mitigators and all the aggravators. I don't think we need to preview all the possibilities.

  THE COURT:  I was looking at the part four of the questionnaire. Mr. McTier would have the opportunity at the sentencing phase to present information referred to as mitigating factors that would suggest the death penalty is not appropriate in this case and mitigating factors are facts and circumstances about the defendant or the crime.

4

That's what the witness was – this juror was talking about. And the reason I have on occasion mentioned a few things about education and background, and as I said those things, I wondered whether it would also be appropriate for me to be completely fair to both sides to mention aggravating factors which the government would be presenting.

  MR. HERMAN:  Yes, it would be. We have no objection, Judge. We know what their aggravating factors are because they listed them in the case. We don't have a problem with that. Give the jurors information and then find out how they feel, and if they come back to the same place, at least, we know that they've had the opportunity to be fully informed about what is going on in the case.

  THE COURT:  Mr. Herman, I understand what it is that you're saying but I think to be completely intellectually honest about what it is we are talking about when a prospective juror says it would depend upon all of the facts and circumstances as to whether he would or he wouldn't, I have little doubt that all of the facts and circumstance would include that, but I'll get the juror in and in the future I'll elaborate on that, okay?

  MR. HERMAN:  Thank you, Your Honor.

  THE COURT:  Really, it's the government's view that the aggravating factors would go into perhaps – perhaps some mention of mitigating factors would be appropriate. Just to make sure that they understand it. The government is going to tell me that it seems that the defendant is trying to already pitch this view of the case. That's what they

are trying to do; is that what you are trying to tell me?

MR. KNOX: No.

THE COURT: I am going to ask do you know what mitigating factors are. Let's start that way. Okay.

MR. HERMAN: Thank you.

(Prospective juror returned to the courtroom)

THE COURT: Thank. We were very, very impressed with your answers regarding how serious a determination a jury maybe called upon to make, but we were just curious as to when you spoke in one of the answers to your question about mitigating factors and you included self-defense and other mitigating factors, self-defense is not a mitigating factor. Self-defense would be a complete defense to the commission of the crime itself.

PROSPECTIVE JUROR: Okay.

THE COURT: When you spoke of mitigating factors what are the sorts of things you had in mine?

PROSPECTIVE JUROR: That is a good question. I really hadn't given it any specific thought as far as what they would be. So, you know, it would be hard right off the top of my head to come up with something to answer that.

THE COURT: Well, there would be such things as the person's background, the education he may or may not have had, the family environment in which he or she may have been living in, employment history, education

PROSPECTIVE JUROR: Yeah, umm, not in each of those by themselves, but put together it could have some interest there, but you know, you, know generally speaking, I'd say you know, it's hard to give a specific answer to it really. Some of the things you mentioned are certainly things that you can consider. How strong those would be and if they come into play, even – there's no way to know until you hear them.

THE COURT: Well, if one were to define mitigating factors, one were to define the word mitigate, it would mean to tend to reduce the seriousness of not completely excuse but tend to ameliorate, soften the consequences of whatever it is that is the subject of consideration. So factors which would tend in that direction would be factors which would be regarded as mitigating factors. I don't know what all of them are that are going to be presented. I mentioned a few which I think might be things that a juror may want to consider in determining whether one alternative sentence is more appropriate than another.

Thank you, very much.

PROSPECTIVE JUROR: Thank you.

(Prospective juror exited courtroom)

THE COURT: As I was listening to the juror's answer the thought that came to mind very loudly and clearly was that the observation that Learned Hand was head to make quite frequently. He was fond of saying that over the portal of every courthouse in the land should be engraved: Think, I beseech yea, in the bowels of Christ that you may be

7

wrong.  It may be that I was not completely right with respect to what a jury may have in mind with respect to mitigating.  What are the mitigating factors:

    MR. HERMAN:    Background, education.

    THE COURT:    Those things that I mentioned.

    MR. HERMAN:    Exactly, upbringing, environment.

    THE COURT:    Something else?

    MR. HERMAN:    If you ask that, we're satisfied.  If the juror says no, that would make no difference to me.

(Tr. at 603-611)

\*   \*   \*

    THE COURT:    Let's move on the juror – oh, by the way, with respect to 74, qualified?  Mr. . . ., do you have a view?

\*   \*   \*

    MR. PERLMUTTER:    Your Honor, I agree that's the case.  When put directly to the individual he was candid.  He said each of the factors that you mentioned he would not consider mitigation.  Now he did say –

    THE COURT:    He didn't say that at all.

    MR. PERLMUTTER:    He said in accumulation he may consider it.

    THE COURT:    Mr. Perlmutter, what is your application?

    MR. PERLMUTTER:    My application is he be dismissed for

8

cause.

  THE COURT:  Denied.

(Tr. at 611-612)

 As to juror #103.

  THE COURT:  What are your feelings about the death penalty, generally? do you have some strong feelings about it, one way or the other? Do you feel the death penalty should always be imposed, never be imposed?

  THE PROSPECTIVE JUROR:  Not always, not never. If it's the law. And the killing was not an accident, if the person was in a clear mind and calculated this killing, so if it's law, he know that it can happen to him. I think it's fair.

  THE COURT:  One of the questions here was a question: Whether the defendant should live or die if convicted of murder is a decision each juror has to make for himself, and do you feel you can make such a decision about whether a defendant should live or die?

  And your answer was, Yes. Somebody have to punish criminals. That was your answer?

  THE PROSPECTIVE JUROR:  Yes.

  THE COURT:  Let me make sure that I understand your answer to one specific question, two parts of it.

  THE PROSPECTIVE JUROR:  Hmm.

  THE COURT:  One of the defendants in this case is accused of

9

committing murders, and the government is seeking the death penalty for that one defendant.  They are all charged with murder, but one defendant is a defendant for whom the [government] is seeking the death penalty.

You may understand by now, and I suspect you do, that in this case where a person is on trial for a crime for which the alternative sentence may be death or imprisonment for life without parole, the case may be divided into two parts.  first, there will be a trial where the jury will have to decide whether the government proved that the defendant is guilty.  So, the jury will hear a lot of evidence about the crime, who committed it, how it was committed, and the jury will have to decide, after listening to all the evidence, whether the government proved, beyond a reasonable doubt, that the defendant is guilty of murder.

Assume the jury returns a verdict of guilty.  There will then be another trial, where the jury will have to decide what the punishment should be, what the sentence should be.  That's a decision for the jury in a case where the sentence could be either death or life imprisonment.

At that trial, the government will present evidence of what the question described as aggravating factors.  The government will present evidence which will seek to support their view that the death penalty is the appropriate sentence.  So, their evidence will consist of evidence concerning the crime itself, how it was committed, who the victims may have been, where it was committed, when it was committed, factors which would tend to support their view that this is a case – the defendant in a

10

case – in which the death penalty is appropriate.

The defendant will then present his evidence to support the view that the death penalty is not appropriate, but the appropriate sentence should be life imprisonment without parole. And so his evidence will consist of, in effect, a picture of his life up to the point where these crimes were committed, his education, his background and so on.

Now, one of the questions was: If you were called upon, as a member of that jury, to decide between the death penalty and life in prison, would you consider the aggravating factors in favor of the death penalty?, and you said no. And the question was: Would you consider the mitigating factors in favor of the life imprisonment without parole?, and you said no.

I suspect – let me not suspect anything. Is that what it was, you wouldn't consider the mitigating factors, the aggravating factors, for the purpose of deciding which would be the appropriate sentence?

    THE PROSPECTIVE JUROR: A little bit the problem is English.

    THE COURT: A little what?

    THE PROSPECTIVE JUROR: It was English.

    THE COURT: English?

    THE PROSPECTIVE JUROR: Yes. So, I think I can make a correct decision.

    THE COURT: Should the answer to both those questions have been yes, you will consider the aggravating factors?

    THE PROSPECTIVE JUROR: Probably, yes.

THE COURT: Just probably, or definitely?

THE PROSPECTIVE JUROR: Yes, definitely yes.

THE COURT: You would consider the aggravating factors and the mitigating factors?

THE PROSPECTIVE JUROR: Yes.

THE COURT: There was a problem of misunderstanding?

THE PROSPECTIVE JUROR: Misunderstanding, yes.

THE COURT: That's all I had in reviewing the questions that I went over.

Is there anything further?

MR. HERMAN: No, your Honor.

MR. KNOX: No, your Honor.

THE COURT: Thank you very much, Mr. One Hundred Three. You'll be notified. Have a good day.

(Tr. at 702-706)

\* \* \*

MR. TALKIN: Judge, I just had a problem – I think he had a problem with language, with understanding. He definitely could understand some things. It's not like he didn't know what was going on. I think anything complex, he didn't quite understand.

I think that he didn't understand the question about aggravators and mitigators, and I'm sure people who spoke also didn't get it. He didn't get it, because he didn't understand the language. And I think that the

problem is going to be, as I had with a couple of jurors in the past, and I know that the RICO charges and all the charges in this case are very complex and even a grad student would have trouble understanding everything, but I think he's going – particularly is going to have difficulty understanding the law in this case, not even getting to the death penalty yet, where it's even more intricate.

I think the law in the RICO case and in this RICO case is going to be very important how they understand the elements of the crime, and I think that is he not suited for this trial. I think he could be a good juror in a case where it's a robbery and a simple one TPO, where there's not a lot of complexity going on, In what I think is the most complex criminal case we can be in, I don't think it's a good juror.

MR. HERMAN: We have concerns about his answer to the death penalty.. When he was first asked his position on the death penalty, he said, If the person had a clear mind and it wasn't an accident, and he felt that the death penalty – I think he was saying the death penalty is always appropriate. He said, Somebody has to punish the criminals. And our concern is that although, when your Honor went through the process, he seemed to be amenable to it, I believe that what he was telling us initially and maybe even on the questionnaire, is that if there's no defense to the crime, to the murder, that he's automatically in favor of the death penalty. So, we move for cause, Judge.

THE COURT: Mr. Moskowitz, do you want to join in?

MR. MOSKOWITZ: I join.

MR. KNOX: Your Honor, with respect to his answer to the death-penalty questions, there were several jurors who initially, in answering the question, offered an example that either would result, in their view, imposing the death penalty, or would prohibit them from voting for the death penalty. But it was clear, at least to us, that when you went through follow-up questions with him about aggravating factors and mitigating factors, about how the process worked, that he was right down the middle in terms of the fact that he would consider both aggravating and mitigating, and that it was not just a case in which the defendant had a clear head, that that would be the only -- that in all of those cases, he would vote for the death penalty. He didn't say that at all.

With respect to his understanding of the English language, at least from my vantage point sitting here, it seemed like he understood your Honor's questions perfectly, and he was answering them all, and his answers were thoughtful and intelligent. His answers in the questionnaire were thoughtful and intelligent, with the exception of aggravating and mitigating. Again, I don't think that's a problem with his understanding of English generally, but he just didn't understand what aggravating and mitigating meant in that legal context, and half the jurors who have come in here haven't understood that.

MR. TALKIN: I want to point to No. 79, where he has a concern. he says himself, Do you know of any reason why you cannot or

should not serve as a juror in this case? He said, The lack of understanding of English.

MR. PERLMUTTER: He even confessed that to you during the question, and said that his English was really at its limits.

THE COURT: Inquiring of this juror, I think that he is not substantially impaired at all.

And what I find remarkable is the assertion or the basis for his confusion about mitigating and aggravating circumstances.

I have been asked by counsel to please make sure that the prospective jurors understand what mitigating circumstances are and what aggravating circumstances are, and if we have a prospective juror who wasn't entirely clear, and I explain it to him, and he then is clear and understands it and says it was a misunderstanding, that becomes a basis for disqualification.

It seems to me that that's being a little less than candid with respect to who is and who isn't substantially impaired.

Your application is denied.

(Tr. at 706-710)

By way of background, it must be noted that to facilitate the very sensitive and extremely difficult process of selecting a "death qualified" jury, approximately 600 prospective jurors were summoned. The limitations of space required that approximately 300 of them assemble in the ceremonial courtroom of this courthouse in the morning, and approximately the same number assembled in that courtroom in the afternoon. The Court addressed each group at some length, informing them of the

nature of the case for which they were summoned to serve and the preliminary instructions regarding burden of proof, presumption of innocence, the introduction of the defendants, their lawyers, the prosecutors and instruction about the objective of the jury selection process being the selection of jurors who would come to the case with an open mind, without bias or prejudice for or against either side, with the ability to consider the evidence to be presented fairly and objectively and follow the Court's instruction as to the law. They were also informed why they are being selected anonymously. The prospective jurors were each then given an 80 question, 51 page questionnaire to complete. Information about their background, education, employment, willingness and ability to follow the Court's instructions as to the law on matters of relevance to the case was elicited. Of the 80, approximately 25 questions designed to elicit attitude and opinions regarding the death penalty were requested. Several weeks were then devoted by the parties to reviewing the questionnaires and eliminating those who were patently unqualified to serve. Surviving that process were 224 jurors, each of whom was then questioned separately, in open court in the presence of all the parties, over a period of 15 days. The answers given on the questionnaires, supplemented by the answers elicited on voir dire and by the Court's appraisal of the demeanor, responsiveness and attitude of each prospective juror who was seated next to him, were the determining factors on qualification to serve.

    Juror #74 is a college graduate whose answers to the questions in the questionnaire were responsive and obviously thoughtful and carefully considered. He answered in an unequivocal affirmative that he would consider aggravating and mitigating circumstances (Q. 59(a) and (b)). His demeanor and attitude during his voir

16

dire left the Court with no doubt that he met all the criteria for jury service in a death penalty case.

An evaluation of Juror #103's questionnaire and his responses to questions put to him during his voir dire was as positive as was my evaluation of Juror #74. His demeanor and attitude similarly caused me to conclude that he too, satisfied all the requirements for jury service in a death penalty case. I was particularly mindful of his concern about his indication of a language limitation in evaluating his questionnaire and during the voir dire. He understood every question I put to him and answered them responsively and without hesitation. Having interviewed, individually, upwards of 220 prospect jurors, it was plainly apparent to me that his spoken English and his comprehension of it compared favorably to most and better than to some and that his indicated difficulty with the language was a reflection of self-consciousness or modesty. His misunderstanding of "aggravating" and "mitigating" was not peculiar to him. It became apparent over the course of this very difficult selection process that not infrequently, the questionnaires, when distributed, were answered quickly, requested answers to questions to which some, if not most, jurors had not previously given thought and did not, for a variety of reasons, take the time needed to ponder precise answers. Answers which, upon voir dire, reflected a misunderstanding of the question or an answer that was incorrect because given in haste, were frequently revealed. In sum, I had no doubt that this juror was qualified to serve and not impaired to any degree.

Only a judge who has experienced the process of selecting a jury in a death penalty case can deeply appreciate the wisdom and accuracy of the observation in Wainwright v. Witt, 469 U.S. 412 (1985), quoted in the most recent case of Uttecht v.

17

Brown, --- U.S. ---, 127 S. Ct. 2218 (2007) at 2223:

> "The Court in Witt instructed that, in applying this standard [whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath] reviewing courts are to accord deference to the trial court. Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; . . . The judgment as to 'whether a venireman is biased' . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. . . And the finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear;' these veniremen will not know how they will react when faced with imposing the death sentence or may be unable to articulate or may wish to hide their true feelings.' Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.'" (Internal citations omitted.)

See also Darden v. Wainwright, 477 U.S. 168, 178 (1986) (The rule of deference to the trial court was reinforced in similarly compelling language.)

The validity of the teaching of Witt and Darden reflects an understanding that the voir dire of a prospective juror in a death penalty case with a view to determining the existence or absence of "substantial impairment" is often a challenging exercise in sociology, psychology, race relations and religion and calls upon the totality of the judge's life experience and insight into the human condition that life's experience provided. In making that difficult determination, the federal judge "has no shelter but his innocence." 604 F.2d at LXVII.

For all the foregoing reasons, the defendant's request to reconsider the Court's decision as regards jurors 74 and 103 is denied.

18

SO ORDERED.

Dated:	Brooklyn, New York
	December 14, 2007

                                    S/
	I. Leo Glasser