UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DWAYNE STONE,

                    Petitioner

        - against -                   Docket. No.  *11-CV-2763 (ILG)*
                                          Docket. No. 05 Cr. 401 (ILG)

UNITED STATES OF AMERICA,

                    Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING RECOMMENDATION (LETTER)**

                                  Anthony L. Ricco, Esq.
                                  Attorney For Dwayne Stone
                                  20 Vesey Street, Suite 400
                                  New York, New York 10007
                                  (212) 791-3919

Steven Z. Legon, Esq.
Of Counsel

**ANTHONY L. RICCO**

*Attorney At Law*

20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007

TEL. (212) 791-3919   FAX. (212) 791-3940

Steven Z. Legon
Of Counsel

July 15, 2014

**FILED BY E.C.F.**

Hon. I. Leo Glasser
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York   11201

   Re: ***Dwayne Stone v.  United States of America***,
     Docket. No. *11-CV-2763 (ILG)* and  05 Cr. 401 (ILG)

Dear Judge Glasser:

  This letter is submitted as Dwayne Stone's sentencing recommendation in view of the order of this court dated July 26, 2013 that granted his writ of habeas corpus which sought to vacate the mandatory life sentence previously imposed under Docket No.  05 Cr. 410 (ILG) pursuant to the Supreme Court decision in *Miller v. Alabama*, 560 U.S. ___ (2012).

**I. Preliminary Note and Summary of Issues Presented**

  In *Miller v. Alabama*, 567 U.S. ___ (2012), the United States Supreme Court held that the mandatory sentences of life without the possibility of parole are unconstitutional for juvenile offenders.   Therefore, upon an initial review, the issue presented by Dwayne Stone's writ seeking resentencing in the wake of *Miller v. Alabama* seemed narrow; a difficult, but nevertheless limited task addressed to a reconsideration of the sentence imposed upon his conviction on count 12, murder in the aid of racketeering.   It was upon count 12, after all, that this court imposed the mandatory life sentence.   Indeed, it is expected that the government will argue that the single issue before this court is whether, in its discretion, the court would reimpose a life sentence or a lesser term of years under count 12.   However, Dwayne Stone is of the view that the Supreme Court's Eighth

Amendment analysis in *Miller* poses a far more challenging constitutional proposition which impacts the sentence imposed on all counts of conviction.

<u>The Eighth Amendment Applies To All Counts of Conviction</u>

Dwayne Stone asserts that upon reconsideration, based upon *Miller*, this court must now re-reconsider the sentences imposed upon all counts conviction.   Such consideration is warranted because due to the sentencing limitations applicable at the time sentence was initially imposed on July 25, 2008, the court did not consider, nor did defense counsel even suggest that the court consider Dwayne Stone's youth and/or the attending circumstances of his youth in determining: (1) whether to impose a sentence at variance with guidelines under counts 1, 2, 3, 11 and 22; and (2) whether the ultimate sentences imposed under counts 1, 2, 3, 11, and 22, when combined with the imposition of the consecutive mandatory under counts 4 and 13 (all imposed without consideration of the attendant circumstances of his juvenile status) served to violate his Eighth Amendment right against excessive punishment.

Dwayne Stone was initially sentenced by this court on July 25, 2008.   At that time, Dwayne Stone's juvenile status and the circumstances impacting his youth simply played no role in whether a sentence at variance should have imposed and/or whether the imposition of the mandatory sentences violated the constitutional protections which must be afforded to an offender, who is sentenced to harsh adult prison terms for crimes committed before his 18th birthday.

While this court made a general reference Dwayne Stone's age and the tragic circumstances of his upbringing, the sentencing proceedings and ultimate sentence imposed was driven and controlled by the mandatory sentences required under counts 4, 12 and 13.   The sentence imposed on counts 4, 12 and 13 resulted in a mandatory term of life to be followed by a combined consecutive prison term totaling 30 years.     The mandatory sentences on these three counts controlled the sentence to be served on the remaining counts.[1]

---

[1]      Dwayne Stone was sentenced as follows: count 1 racketeering (292 months); count 2, racketeering conspiracy (292 months); count 3, conspiracy to distribute and possess with intent to distribute cocaine base (292 months); count 4, the use of and carrying a firearm during and in relation to a drug trafficking crime and a crime of violence (5 years or 60 months); count 11, conspiracy to commit murder in the aid of racketeering (10 years); count 12, murder in the aid of racketeering (mandatory life); count 13, the possession of stolen firearms (25 years or 300 months); count 22, transportation of stolen firearms (41 months).   Therefore, sentences imposed sentences on counts 1, 2, 3, 11, and 22, resulted in a term of 292 months to be followed by a combined consecutive prison term totaling 30 years on counts 4 and 13.

In *Miller*, the Supreme Court, further extended the reasoning advanced in its landmark decisions in *Roper v. Simmons*, 543 U.S. 551 (2005) and *Graham v. Florida*, 560 U.S. 48 (2010) and held that the Eighth Amendment protected offenders from criminal conduct committed prior to their 18th birthday included prosecutions for murder.   In *Miller*, the Supreme Court reiterated that the "concept of proportionality is central to the Eighth Amendment" and that a sentencing court must therefore consider the frailties of age when imposing harsh prison sentences of the type which are imposed upon an adult offender.

The Supreme Court observed that "age matters" and that juveniles are less mature and more prone to impulsive, and heedless risk-taking; and are particularly vulnerable to recklessness and negative peer pressure.   The Supreme Court observed that since adolescence is transitory, juveniles are less likely to be found "irretrievably depraved."  The Supreme Court held that the sentencing court must, therefore, consider a juvenile offenders age and consider that the hallmark features which include, *inter alia*; immaturity, impetuosity, the failure to appreciate risks and consequences, family and home environment that surrounds the juvenile and the manner in which peer pressures may have effected the juvenile offender and his participation in the charged offenses.

The Supreme Court ruled that an offender's age must be considered in view of the application of mandatory sentences (and by persuasive constitutional analysis non-mandatory sentences) whenever a juvenile is sentenced to a harsh period of incarceration which precludes a meaningful opportunity for reclamation and rehabilitation.  Writing for the court , Judge Kagan said that the state "must provide some meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation."   In this case, the sentence of mandatory life imposed on count 12 clearly fails to accomplish these constitutional goals.  In addition,  the combined sentence of 54 years imposed on counts 1, 2, 3, 4, 11, 22 and 13 also fails to accomplish the constitutional goals set forth by Supreme Court in *Roper, Graham* and *Miller*.

As a result, and for the reasons set forth below, the defense asserts that logic and meaning of the Supreme Court's decisions in *Roper, Graham* and *Miller*, require this court to consider Dwayne Stone's age and the attending character and circumstances of his upbringing in (1) reconsideration of the sentence on count 12; but also (2) to determine what impact, if any, Dwayne Stone's age and upbringing and community circumstances factors into the re-consideration of the sentences imposed on the remaining counts, in which his age and upbringing was previously excluded from consideration.

While it is true that *Miller* and *Graham* addressed mandatory life sentences, however, the Eighth Amendment analysis adopted by the Supreme Court applies equally to a term-of-years sentence of the type imposed by this court under counts 1, 2, 3, 4, 11, 13 and 22 in this case.  The Supreme Court has never said as a *per se* matter that a term-of-years sentence

will necessarily survive a proportionality analysis; an observation recently noted by the Fourth Circuit in *United States v. Hashime*, 722 F.3d 572 (4th Cir. 2013).  In *Graham* itself, the Supreme Court noted that its "cases addressing the proportionality of sentences" include "challenges to the length of term-of-years sentences given all the circumstances in a particular case."  See, *Graham*, 130 S.Ct. 2021.  In fact, the Supreme Court has strongly suggested Eighth Amendment proportionality review applies equally to both life and term-of-years sentences, as it has proclaimed "no penalty as per se constitutional," *Solem v. Helm*, 463 U.S. 277, 290 (1983); and the "[t]he Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to non-capital sentences," *Ewing v. California*, 538 U.S. 11, 20 (2003)(quoting *Harmelin v. Michigan*, 501 U.S. 957 (1991).  See, *United States v. Hashime*, supra, 722 F.3d at 574-575.

On counts 1, 2, 3, 11, 13 and 22, this court imposed a sentence combining for a total a 54 year prison term, based upon conduct of Dwayne Stone that he engaged in before his or her 18th birthday.   When more than half of the 50 year sentence is based upon the imposition of a mandatory minimum period of incarceration and the remainder is based upon a sentencing regime which prohibited the court from the consideration of the attending character and circumstances of the juvenile offender's youth (lack of youthful guidance), such a sentence cannot survive Eighth Amendment scrutiny and/or the court's post-*Booker* authority under 18 U.S.C. § 3553, which requires a consideration of the background and history of the offender (at any age).

## II.  Application of the Law - Juvenile's Age Matters

Over the past decade, the United States Supreme Court has handed down a series of landmark decisions which have revolutionized the manner in which sentencing court are required to address issues pertaining to sentencing a juvenile offender for criminal acts committed before the offender reaches his or her 18th birthday.    Starting with *Roper v. Simmons*, 543 U.S. 551 (2005), followed by *Graham v. Florida*, 560 U.S. 48 (2010) and ultimately *Miller v. Alabama*, 560 U.S. ____ (2012) , the Supreme Court has made clear, that when it comes to sentencing juvenile offenders to harsh prison terms of the type imposed upon adult offenders, the sentencing court must take into account the defendant's youthfulness and the attending circumstances.   In the words of the Supreme Court when it comes to imposing a harsh prison sentence upon a juvenile offender *youth matters* on the issue of sentencing.

At the core of the Supreme Court's rationale in the decisions in *Roper*, *Graham* and *Miller* is the Eighth Amendment prohibition against cruel and unusual treatment.   The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions."  *Roper* v. *Simmons*, 543 U.S. 551, 560 (2005).  That right, according to the Supreme Court, "flows from the basic

'precept of justice that punishment for crimes should be graduated and proportioned' " to both the offender and the offense.  *Id.*   Constitutional concerns are raised whenever a juvenile is sentenced to a harsh term of imprisonment of the length that would be imposed upon an adult offender.

The Supreme Court has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. See, *e.g., Kennedy* v. *Louisiana,* 554 U. S. 407 (2008).   In our society, juveniles offenders are considered to have a lesser level of culpability than adult offenders.   Therefore, the Eighth Amendment prohibition against excess punishment is raised when juveniles are categorically sentenced to the same harsh prison terms imposed upon adults.   In *Roper v. Simmons*, *(*a capital punishment case*), Graham v. Florida* (no mandatory life for non-homicide offenses) and *Miller v. Alabama* (no mandatory life for murder) have specially focused on juvenile offenders, because of the offenders' lessened culpability and the potential for rehabilitation for crimes committed in childhood.

The Supreme Court decisions in *Roper, Graham* and *Miller* establish that a juvenile offender is constitutionally different from an adult for sentencing purposes and that constitutional protections must be employed to secure proportioned penalties.   According to the Supreme Court, juvenile offenders "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings.  *See, Roper v. Simmons,* supra, 543 U. S. at 569.   The Supreme Court has also observed that juvenile offenders' "lack of maturity" and possess an "underdeveloped sense of responsibility,"which " lead to recklessness, impulsivity, and heedless risk-taking.  *See, Roper v. Simmons, Id*.  The Supreme Court has observed that a child's character is not as "well formed" as an adult's and as a result his traits are "less fixed" and his actions are less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.,* at 570.   In *Roper, Graham* and *Miller* the Supreme Court emphasized that the distinctive attributes of youth diminish the "*penological*" justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes such as murder.

In *Miller*, the Supreme Court, extended the rationale of *Roper* and *Graham* and reiterated that an offender's age "is relevant to the Eighth Amendment," and reasoned that "criminal procedure laws that fail to take a defendants' youthfulness into account at all would be flawed." *Miller v. Alabama*, supra, 567 U.S. ____ (2012) slip op. At 11 (quoting *Graham)*.   The Supreme Court held that when the concept of youth is removed from sentencing consideration, and thereby subjects the juvenile to a harsh sentence applicable to an adult, such laws prevent the court from assessing whether the law's harsh terms of imprisonment proportionately punishes a juvenile offender.   *Id.*

Sentencing Regime in this Case Employed was Constitutionally Flawed

There are two aspects of the sentencing of Dwayne Stone which require re-examination in light of the Supreme Court's decision in *Miller*.

It is without dispute that the mandatory life sentence imposed upon count 12 of the superseding indictment is constitutionally flawed in the wake of *Miller*. However, setting aside the mandatory life sentence imposed on count 12 of the superseding indictment, the guideline sentence of 292 months (counts 1, 2, 3, 11) to be followed by a combined mandatory consecutive of 30 years in prison (count 4 [5 years] and count 13 [25 years]), is constitutionally flawed since the sentencing regime resulted in the imposition of 54 years of incarceration upon a juvenile offender, which failed to take into account the offender's youthfulness and the attending factors the Supreme Court deemed critical to an Eighth Amendment analysis.

While it is true that the Supreme Court's decisions in *Roper*, *Graham* and *Miller* were cases involving the death penalty and/or the imposition of mandatory life without parole, as stated above, there is nothing doctrinally or logically that distinguishes the Eighth Amendment analysis in those decisions from its applicability to the imposed a prison term of more than 50 years upon an offender for conduct that which took place before his 18th birthday. The critical reasoning that *youth matters,* along with the Eighth Amendment constitutional protections remain the same, since term of 50 plus years in prison to be served for conduct committed before an offender reached his 18th birthday clearly qualifies as harsh. The Supreme Court has observed in *Miller* that a sentencing court cannot impose these harsh penalties on juvenile offenders, proceeding as though they are not children.

Statutory Mandatory Minimum Sentences

In this case, the court was required, by statute and the Guidelines, on count 4 to impose a term of 60 months (5 years) on count 4 to be served consecutive to the sentences imposed upon counts 1, 2, 3, 11, 12 and 22. See, 18 U.S.C. § 924 (c)(1)(A)(i); Guideline 2K2.4(b). By statute and the Guidelines, the court was required to impose an additional term of 300 months (25 years) on count 13 to be imposed consecutive to counts 4 and consecutive to counts 1, 2, 3, 11, 12, and 22. See, 18 U.S.C. § 924 (c)(1)(A)(iii); Guideline 2K2.4(b). The court, however, imposed a mandatory period of incarceration upon Dwayne Stone under count 13 for conduct committed before his 18th birthday, without any regard to individualized sentencing or an assessment of whether any of the factors that the

Supreme Court held needs to considered when sentencing a juvenile offender to a harsh prison term for conduct committed before his 18[2] birthday.

The mandatory penalties in this case precluded this court from meaningfully "taking into account the juvenile offender's age and the wealth of characteristics and circumstances attendant to it." See, *Miller v. Alabama*, supra, 567 U.S. ___ (2012), slip op., page 14. As observed by the Supreme Court in *Miller*, "*the sentencer misses too much if he treats every child as an adult.*" See, *Miller v. Alabama*, supra, 567 U.S. ___ (2012), slip op., page 14.

This constitutional flaw, the failure to consider youth and the attendant characteristics and circumstances, is further exacerbated in this case, since the combined total of 30 years of mandatory imprisonment was imposed to be served consecutive to a guidelines sentence of 292 months (24 years) in prison. In reaching the sentencing range of 292 months, the now advisory guidelines nevertheless absolutely prohibited and forbade the court from considering the individual attendant characteristics and circumstances of Dwayne Stone's youth. See, Guidelines, §5H1.12 [lack of youthful guidance and disadvantaged upbringing not relevant] Under the sentencing guidelines, a sentencing court is absolutely prohibited from considering the very powerful factors that served to derail Dwayne Stone's life, that the Supreme Court held must be considered.

<u>The Federal Sentencing Guidelines - Juvenile's Age and Lack of Guidance</u>

The sentences imposed under counts 1, 2, 3, 11, and 22 were based entirely upon the applicability of the now advisory sentencing guidelines. Some of the conduct under counts 1, 2, 3 and 4 took place, in substantial part, before Dwayne Stone reached his 18th birthday (1998 through November 6, 2000). The criminal conduct under counts 12 and 13 took place in its entirety before Dwayne Stone reached his 18th birthday.

As stated above, the Guidelines absolutely prohibit the sentencing court from considering the attendant circumstances and characteristics of youth, where those circumstances have served to derail the life of the offender. This absolute prohibition

---

[2] On the conviction under count 13, the court imposed a powerful consecutive mandatory sentence of 25 years for criminal conduct which took place before Dwayne Stone reached the age of 18 and is therefore directly impacted by a *Miller* Eighth Amendment analysis. However, the time period of the criminal acts upon which Dwayne Stone was convicted on under count 4 includes time period both before and after his 18th birthday. The phenomena in which Dwayne Stone is stripped of any consideration of individual factors impacting his state of mind or the commission of the offense after his 18th birthday and is thereby exposed to powerful consecutive sentences, serves to underscore the importance of the consideration of the *Miller* concerns for youth on each of the counts for criminal conduct which took place before his 18th birthday.

7

applies whether the guidelines sentencing range is 6 months, 292 months or life (without the possibility of parole). This blanket guideline prohibition, which was applied to Dwayne Stone's sentencing under counts 1, 2, 3, 11 and 22 is completely contrary to sentencing philosophy and common sense reasoning applied by the United States Supreme Court in *Roper*, *Graham* and *Miller* and has also served a substantive part in and in combination with the mandatory sentences imposed under counts 4 and 13, to violate Dwayne Stone's Eighth Amendment against excessive punishment.

Notwithstanding the Eighth Amendment issue, the blanket prohibition under guideline 5H.12 is also contrary to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, which required the sentencing court to treat the Dwayne Stone, at sentencing, as individual and to consider the his background and history.

In the post-*Booker* era, the court is required to impose a sentence which is sufficient, but not greater than necessary to achieve the sentencing goals of Congress. *Gall v. United States*, 552 U.S. 38 (2007). In this case, there are sufficient factors related to the history and background of Dwayne Stone (his age and lack of parental guidance), along with the Eighth Amendment issues raised in imposing a sentence with a mandatory 25 year consecutive sentence on count 13 without consideration of the Miller factors, which would serve to justify the imposition of a sentence at variance with the guidelines on all counts.

Under the guidelines, a sentencing court is absolutely prohibited from considering the factors that served to derail Dwayne Stones' young life. See, Guidelines, §5H1.12 [lack of youthful guidance and disadvantaged upbringing not relevant]. In the post-*Booker* era, however, the court can now justly and fairly consider his exposure to abuse at home, drugs and the high level of violence in his community and his failure to emergence from a chaotic disadvantaged upbringing in assessing the length of punishment to be imposed (the very same factors the Supreme Court discussed in *Roper, Graham* and *Miller*).

In the absence of the now advisory provisions which often resulted in the mechanical adherence to the sentencing guidelines:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing a sentence.

See, 18 U.S.C. § 3661. The application of the guidelines prevented the court from a true and accurate constitutional assessment of the powerful influences which served to derail Dwayne Stone's life. This issue is significant in this case, since there is a direct relationship between the tragedy faced by Dwayne Stone in his childhood, early teen years and the

circumstances of the offense.   Not only was Dwayne Stone abused at home by his mother, but his own father took him into the streets at age 11 exposing him to culture of drugs and violence in Brownsville and thus teaching him to become ruthless.

Under the guidelines, sentencing courts were forbidden to consider the lack of youthful guidance to support a sentence outside the application guideline range.  See, Guideline, §5H1.12.    That guideline has been scrupulously adhered to by sentencing courts in the pre-*Booker* era.   However, the tragic irony of such a rule, is that it is contrary to the Supreme Court's reasoning in *Roper*, *Graham* and *Miller* and plain common sense.

The directives of *Booker* and the statutory language of 18 U.S.C. § 3553(a) make clear, however, that the court must now consider all the sentencing factors, many of which the guidelines either completely rejected or ignored.   For example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant."  Such an approach to sentencing is consistent with the Supreme Court decisions in *Roper, Graham* and *Miller*.

Imposition of a Sentence at variance with the guidelines

Dwayne Stone requests that the court impose a sentence at variance with the guidelines on counts 1, 2, 3, 11, 12 and 22 based upon the court's authority pursuant to *Booker v. United States*, 543 U.S. 220 (2005)  and 18 U.S.C. 3553(a).

Although the sentencing guidelines are no longer mandatory, the court is nevertheless required to consider the Guidelines range and render a guideline analysis before making its ultimate sentencing determination.  See, *United States v. Booker*, 534 U.S. 220, 245-246 (2005).  However, as stated above, a sentence impose  in this case, which fails to account for, or even recognize the hardship faced by Dwayne Stone in his formative years, is simply constitutionally flawed.

In recent years, the Department of Justice itself has authored several reports on the devastating impact that negative risk factors have on the ability of the young children to grow into responsible decision makers.  These reports and help us understand how the circumstances children are born and raised destroys the lives.  See, Bulletin Series, *Risk and Protective Factors of Child Delinquency*, U.S. Department of Justice, Officer of Programs, Office of Juvenile Justice and Delinquency Prevention 2003 (edited by Wasserman, Keenan, Trembly, Cote, Herrenkohl and Petechuk).[3]

---

[3]       The Child Delinquency Bulletin was drawn from the Study Group's final report, which was completed in 2001 under grant number 95–JD–FX–0018 and subsequently published by Sage Publications as *Child Delinquents: Development, Intervention, and Service Needs* (edited by Rolf Loeber and David P. Farrington).

According to a 2012 study conducted by the Department of Justice, under the auspices of the Office of Juvenile Justice and Delinquency Prevention, enduring parental neglect and abandonment, and physical abuse as a child and life in a dangerous violent environment can lead to serious adverse consequences throughout that child's development and well into his adulthood.  The Department of Justice report advises that children exposed to this type of maltreatment and abuse are at risk for developing symptoms of trauma such as depression, anxiety and hyper vigilance.   In addition, according to the Department of Justice report these exposed children have a greater risk of developing cognitive and developmental impairments which can lead to violent behavior as a form of self-protection and control.  Furthermore, these traumatic experiences can cause feelings of powerlessness when faced with intimidations or conflict, leading some children to compensate with aggressive behavior such as truancy, or joining a gang.[4]

The 2012 Department of Justice study refers to the concept of "having experienced multiple victimizations of different kinds, such as physical abuse, bullying, and exposure to family and community violence" as polyvictimization.[5]  The combination of such forms of abuse, maltreatment and violence is lethal: "increasing the risk and severity of posttraumatic injuries and mental health disorders by at least twofold and up to as much as tenfold, as well as, diminishing the likelihood of developing the fundamental capacities necessary for normal development, successful learning, and a productive adulthood."  Without appropriate intervention and/or treatment, results can be disastrous.    The disaster in what has become the life of the children born and raised into the violence of Brownsville is powerful and must be taken into account at the time of sentencing.

A Title 18 U.S.C. 3553(a) sentencing analysis employs broader concepts in which the court can consider the interplay between background and experiences of the individual young offender for acts committed prior to his 18th birthday.   The statute, while broad in concept, places an emphasis on the individualized circumstances relevant to the sentencing of an offender and is therefore more appropriate for the issues present in this case.   Title

---

[4]       Defending Childhood was drawn from a Report of the Attorney General's National Task Force Children Exposed to Violence.  This project and ensuing report was supported by a grant awarded by the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice and completed in December of 2012.

[5]       Polyvictimization: Children's Exposure to Multiple types of Violence, Crime, and Abuse.  Bulletin: National Survey of Children's Exposure to Violence series, October 2011.  This Bulletin presents the findings of the National Survey of Children's Exposure to Violence (NatSCEV) regarding children's direct exposure to multiple types of violence, crime and abuse, also known as polyvictimization. **http://www.ojdp.gov/publications/PubResults.asp#2011.**

18 U.S.C. § 3553 (a) instructs the district court to impose a sentence that is sufficient but not greater than necessary to reach the sentencing objectives of Congress.

In this case, those objectives of punishment for the offense, deterrence, promoting respect for the law and protecting the public from the future crimes of the offender, are satisfied by a combined 40 year period of incarceration for the first-time offender. Therefore, on behalf of Dwayne Stone, it is requested that the court impose a sentence of 120 months (10 years) incarceration at variance with the sentencing guidelines, pursuant to 18 U.S.C. § 3553(a) on counts 1, 2, 3, 11, 12 and 22 based upon the combination of the issues raised herein, to be followed by a combined total of 30 years consecutive.

### III.   Sentencing Recommendation

The  most compelling reason to sentence Dwayne Stone to less than life,  is that the court now has the discretion and authority to take a critical look at the confluence and influence of negative risk factors present in Dwayne Stone's history and make an assessment of his potential for reclamation and redemption.   Those risk factors include Dwayne Stone's abuse at the hands of his parents and his exposure at a young age to one of the most dangerous neighborhoods in our nation, with an exceptionally high level of despair and a proliferation of dysfunctional loosely organized gang violence involving teenaged boys.

Prior Sentence Imposed By The Court

At the time of the initial sentencing in this case, two critical events took place which give rise to reconsideration of the ultimate sentences imposed: (1) the court believed that it did not have the discretion to give full consideration to the powerful risk factors influencing the upbringing of Dwayne Stone; and (2) defense counsel's failure to set forth important reasons for a sentence at variance with the guidelines.

At the initial sentencing, the court only generally addressed issues pertaining to the Dwayne Stone's childhood, upbringing and the violence in his community, along with the negative influences of his father, Dwayne Stone, Sr.   See, *Sentencing Transcripts*, pages 7 and 8.

The court remarked:

> Mr. Stone, your lawyers have told you, given the nature of the crimes that you were found guilty of, the court has no discretion at all.   The Court is required to impose a mandatory

> sentence of life imprisonment and two consecutive terms, one
> of 5 years and one of 25.

*Sentencing Transcripts*, page 10.  The combined Supreme Court decisions in *Booker v. United States* and *Miller v. Alabama* have granted this court the discretion to consider a sentence less than  life and at variance with the guidelines.

In addition, as stated above, at the time of the initial sentencing Dwayne Stone's counsel did not provide the court with any additional information pertaining the childhood, background and influences in Dwayne Stone's upbringing, other than that which was set forth in the Presentence Investigation Report and did not make a single argument for the court to consider a sentence at variance with the guidelines.   Defense counsel simply conceded that this court was mandated to sentence the Dwayne Stone to life and, according, did not offer any contrary arguments.

Defense counsel stated:

> Judge, if there was anything that I could say that would change the outcome today, there would be a lot I might be able to say. I think the report (*PSR*) reflects the circumstances of Mr. Stone's upbringing, what brought him before this court. Unfortunately, what given the charges and the nature o the charges in this case, the court's decision is limited and nothing that I could say would affect the sentence that this Court must impose, so I don't think there's anything that needs to be said at this point.

*Sentencing Transcripts*, page 10.    There is, in fact, much to be said about the proliferation of negative risk factors present in Dwayne Stone's home life, upbringing and community and the devastating manner in which they converged to influence his individual development as a teen and the powerful external circumstances that brought him before the court for sentencing.[6]

---

[6]      In support of this sentencing recommendation, I shall submit under seal a mitigation submission report prepared by the attorneys in the pre-death authorization stages of this case.   As the court may recall, this cases began as a death eligible case.   While the Attorney General ultimately decided against the authorization for the death penalty, learned counsel was appointed by the court, who began an extensive mitigation investigation of Dwayne Stone. The mitigation investigation included interviews with family members, community members, prior school teachers and other concerned individuals in Brownsville.   The report was prepared at considerable expense to the CJA budget is far more detailed than the PSR and has therefore been submitted to assist the court in making an assessment of the individual circumstances and

Overview of Dwayne Stone's Formative Years

As a child, Dwayne Stone began his life full of promise for a safe, secure and bright future.  Unbeknownst to Dwayne Stone, however, was that he was born to dysfunctional teenaged parents who resided in a dangerous community environment, a neighborhood which has served to destroy the lives of children for more an a half a century.   Dwayne Stone was born and raised in Brownsville, a notorious community known for decades as the per capita "*murder capital of New York City*."   Dwayne Stone's fate was in the hands of parents, who themselves, failed to overcome the crushing conditions in Brownsville and showed no interest in equipping their son to become a productive member of our society.

Like many children growing up in the Brownsville section of Brooklyn, Dwayne Stone, was a promising small boy who, without guidance and support, failed to overcome the crushing conditions of poverty which society has permitted to exist in Brownsville, Brooklyn for the past 50 years or more.  The combined presence and influence of these powerful negative risk factors, both at home and in his community, not only served to derail Dwayne Stone's life, but also served to destroy the lives of the individuals who are victims in this case, who each participated in extreme levels of dysfunctional street violence directed towards other teens.

By the time of Dwayne Stone's birth, the Brownsville section of Brooklyn had descended into one of the worst and extremely violent neighborhoods in our county.   At the time of the commission of the, once death eligible, crime charged in the superseding indictment, Dwayne Stone had yet to reach his 18th birthday.  Born on November 6, 1982, Dwayne Stone was seventeen (17) years old at the time Jamal Washington, also a seventeen (17) teen year old, was shot and killed on October 6, 2000, in Brownsville, New York. Jamal Washington was one of the 241 people murdered in Brooklyn in 2000.

On October 6, 2000, seventeen (17) year old Dwayne Stone participated in two terrible crimes, crimes which required this court to impose a mandatory life sentence under count 12 and a mandatory consecutive term of 25 years pursuant to count 13.  Both charged offenses, the murder in the aid of racketeering and the possession and use of the firearm, took place under circumstances deeply rooted in the dysfunctionalism of a small neighborhood in Brooklyn which stands alone in our state in it's crushing economic depravity and pervasive level of hopelessness.   Soaring drop out rates, drug addiction, teen pregnancies, and extreme levels of street gang violence is a way of life in Brownsville, New York which permeated and eventually overpowered the lives of both Dwayne Stone and Jamal Washington.

_____

community barriers that Dwayne Stone endured during his juvenile years.

13

Notwithstanding his extraordinary exposure to violence at a very young age, Dwayne Stone, who is now 31 years of age, is a young man who, based upon the progress shown in his prison record, is capable of both a positive adjustment in prison and who is capable of reclamation and redemption; qualities that the Supreme Court must consider when sentencing a offender for juvenile conduct committed before his 18th birthday.

## A. The Origins of Gang Violence in Brownsville and The Death of Innocence

There is no question that the driving force for the consideration for an enhanced sentence in this case is the seemingly senseless acts of violence engaged in by Dwayne Stone. While this sentencing does focus on Dwayne Stone, it is the loss of the promise of Jamal Washington's young life, that has an equally most compelling driving force.

However, upon a deep insight into the circumstances that led to and triggered the death of young Jamal Washington, along with the circumstances of Dwayne Stone's life, it becomes clear that the fate of both young men are tied to the presence of a social phenomenon that has resulted in unprecedented levels of violence among our young teenagers.

The Environment of Poverty, Disillusionment and Death in Brownsville

Dwayne Stone was, like many other generations of young boys who grew up in Brownsville, drawn into the trap of the street life and violence based upon a combination of factors which are completely discounted and or marginalized by the guidelines. This case involves the same extreme level of violence engaged in by young African American males who have been prosecuted in federal court with the distribution of narcotics and extreme levels of violence in Bedstuy, Crown Heights, Brownsville and East New York sections of Brooklyn over the past 25 years. At the center, and standing above the levels of violence and murder in Brooklyn over the past 25 years, is Brownsville - the per capita murder capital of New York City.

The case upon which Dwayne Stone was tried and convicted centered on street level drug dealing and murder in and around the Marcus Garvey Village and Riverdale Towers public housing complexes. Marcus Garvey Village, a sprawling housing complex in the center of the Brownsville section of Brooklyn, an extremely violent neighborhood, where the only rival to the decades of lawlessness, gangs, drugs and violence, is the profound sense of hopeless exhibited by the children who are born and raised there.

Brownsville, a neighborhood covering approximately 2.1 just square miles, has the highest concentration of public housing projects in our entire nation and has long been considered one of the most dangerous communities in the country. Within the 2.1 square

miles, there are 18 New York City Housing Authority public housing complexes with over 100 different buildings.    At the center of this concentration of public housing is the notorious Marcus Garvey Village public housing complex.  Marcus Garvey is surrounded by several other dangerous public housing developments including the equally notorious Samuel J. Tilden public housing projects; the Brownsville public housing projects; the Howard public housing projects; the Glenmore public housing projects, the Seth Low public housing projects, the Van Dykes public housing projects and 11 others - totaling more than 79 buildings with more than 15,000 low income residents.  These public housing projects are served by the 73rd New York City Police Precinct, with an assist from the Public Service Area, P.S.A. No. 2, which patrols the sprawling public housing projects owned by the New York City Housing Authority.

The proliferation of the sale of drugs and street violence in and around the public housing projects in Brownsville existed long before the relevant time periods of the indictment of this case (1998 to 2003) and has continued on with impunity since that time. The proliferation of poverty, drugs, violence and despair in Brownsville is so pervasive and devastating, that local law enforcement is virtually powerless to curb the legions individuals willing escape from misery of their lives with the daily consumption of narcotics nor the endless stream of youth who descend into impetuous, impulsive acts of extreme violence seeking a twisted sense dignity and self respect.

This tragic phenomenon results from years of intentional, deliberate political, societal and economic neglect, are the conditions in which Dwayne Stone was born and raised.  The phenomenon has its origins in the racial policies of the Fair Housing Act of 1947, the great migration of Negroes in the late 1940s and 1950s fleeing horrific racial segregation in the south and the white flight which took place in Brownsville and East New York in the 1960s.

The Impact of *De Facto* Segregation

In the 1940s the demographics of Bed–Stuyvesant, Brownsville and East New York changed dramatically.  Central Brooklyn became home to African Americans who were escaping the brutal conditions and repression of the Jim Crow south and who were seeking a better life and employment opportunities in the "promised land" of northern urban communities.  See, Kenneth T. Jackson, *Encyclopedia of New York* 94 (1995);  T.J. English, *Savage City*, page xiii.    In fact, this historical phenomena called "The Great Migration" which intensified during the mid-1940s, is unparalleled as the single greatest domestic shift of a population of people within our nation's borders.  T.J. English, *Savage City*, page xii.

The new dark complected residents were met with fear, hostility and outright racism by whites whom they were rapidly replacing.  "White flight" occurred, in direct response

to black and brown people moving into white urban neighborhoods.  As African Americans poured into Central Brooklyn in the mid-1940's, whites began their own migration fleeing the  borough *en masse* for the suburbs.[7]

The infrastructure of Brownsville simply was not designed to  accommodate the sudden and rapid influx of African American's, many uneducated and illiterate, escaping the rural south.  There were simply not enough jobs, housing or classroom space for the new burgeoning black and brown residents.  Over crowding, lack of economic opportunities and the limitations imposed by a new form of racism, served to create an environment ripe for an explosion in criminal activity - including drugs and violence.[8]

There were no governmental or municipal programs to deal with such a massive shift in the racial composition of the Borough.  See, *The Rise and Decline of the American Ghetto,* David M. Cutler, Edward L. Glaeser, Jacob L. Vigdor *The Journal of Political Economy*, Vol. 107, No. 3 (Jun., 1999), pp. 455-506.  National and local governments never seriously addressed the compelling social issues that plagued, and continue to plague Brownsville and other inner city neighborhoods destroyed before, during or after the crack era.  Other than warehousing young African American offenders to draconian prison sentences, our federal, state and city governments have done very little to ameliorate the horrific conditions which drove generation after generation into the streets as drug abusers, drug dealers and perveyors of extremely levels of violence.

The reward for escaping the brutal repression of the South, was to be crammed into overcrowded communities with decaying housing stock, and with little or no opportunity for economic or social advancement.  Waiting in the wings for the children of the Great Black Migration, was the decision of organized crime families to profit from this misery, by flooding these urban areas with powerful drugs.  First, heroin in the mid to late 1960s, cocaine in the 1970s, and later  powerful crack-cocaine of the 1980s.  These drugs served to destroy the dreams of African Americans.   Drugs, just like a prescribed pain killer,

---

[7]     In a five year period during the 1960s, the Brownsville/East New York section of Brooklyn, went from being 80 percent white to 80 percent African American.  See,  *How East New York Became a Ghetto,* by Walter Thabit, page 42; T.J. English, *Savage City*, page xiii.

[8]     New forms of lawful discrimination, racial restrictive covenants and later "red lining" prevented African Americans from taking up residence in newly developing communities in the suburbs.  African Americans, without meaningful political power, were trapped into overcrowded urban ghettos across the northeastern United States.  These horrible conditions exploded and were site of violent riots in the 1960s.  Cleveland, Ohio, (1966) Chester and Philadelphia, Pennsylvania (1964), Harlem, Bed-Stuy, Brownsville, New York (1967), Detroit, Michigan (1967), Newark, New Jersey (1967), Roxbury-Dorchester, Massachusetts (1967), Baltimore, Maryland (1968); Chicago, Illinois (1968); are just a few examples.

served to dull the sad reality of living with a new form of racism and control - *de facto* segregation.

The results were catastrophic; the lack of opportunity and overcrowding created a breeding ground for criminal activity and the violence that we see today. The promised land of opportunity turned into a nightmarish new level of social and political repression which provided a gateway for the eventual destruction of African American families in urban ghettos such as Brownsville.

Young people like Dwayne Stone's parents, who grew up in Brownsville during the 1960s and 1970s, fell victim to the trap. The pervasive influence of drugs destroyed their lives and in turn the lives of their children. African Americans in ghettos across our country, all suffering from the same socio-economic strangulation, all suffering the lack of meaningful direction from insightful leadership, turned their pain inward. The moments of euphoria that the drug supplied, provided desperately needed relief from the powerfully deep feelings of hopelessness and despair that gripped the African American community. Murder and violence replaced sacrifice, struggle and hope. In the absence of parental direction and guidance, children were left to roam the streets for survival. Born into a community of people without hope or faith in the promise of the future, these children adopted violence to both protect themselves and to survive.

Dwayne Stone is one of those children. Any person who spends any meaningful time with Dwayne Stone, will find a beautiful young man who once dreamed of a normal life for himself and his family. However, his dreams were overcome by the violence prevalent in Brownsville. Poverty and hopelessness has traditionally been the breeding grounds for gang culture and its associated violence throughout the history of our nation. The Irish street gangs flourished in the poverty of the "Five Points" section of New York City in the mid 1800's. Italian street gangs controlled the economics of the lower eastside in Manhattan and the south-side of Chicago in the 1920s and 1930s. In fact, the notorious "Murder Inc." has its origins in Brownsville, the place where Myer Lansky was born and raised. Street gangs known as the Savage Skulls, The Nomads predominated the streets of the South Bronx and parts of Harlem during the 1960s and 1970s. Today, more so than ever, our nations segregated neighborhoods, once known as ghettos, are overwhelmed with the proliferation of gangs and seemingly indiscriminate violence throughout our nation.

The violence surrounding the indictment is grounded in disputes among low level street gangs over street turf in Brownsville. Brownsville, like the south Bronx, Harlem, south-side of Chicago, Chester, Pennsylvania, Camden, New Jersey, Park Heights and West, Baltimore, Gary, Indiana and East, Los Angeles is yet another community crippled by white flight, paralyzing *de facto* segregation and economic abandonment. The modern

emergence of urban gangs and violence has been memorialized in documentaries, scholarly, academic publications and Hollywood movies such as "Boyz n the Hood," "New Jack City" and many others.  The phenomenon of the despair and the emergence of the culture of violence in Brownsville, Brooklyn has been recently memorialized in a June 13, 2014, New York magazine article n article entitled "*The Playground Gangs of Brownsville, - Woo Cho Bang, Bang*" by Eric Konisgberg and May 1, 2014, New York Times article entitled "*On The Brink in Brownsville,*" by reporter Mosi Secret.

Both articles examine and explain the economic devastation and the high  levels of lawlessness, chronic despair and associated violence present in Brownsville for decades. The articles provide a powerful insight into how the children of Brownsville perceive the extraordinary levels of violence present in their lives and how "*Brownsville's darker corners suck up all but the most exceptional boys.*"  See, "*The Playground Gangs of Brownsville, - Woo Cho Bang, Bang*" by Eric Konisgberg.

**B.     The Intersecting Lives of Dwayne Stone and Jamal Washington**

In this case, Dwayne Stone was, as all the defendants and victims in this case, raised in a dangerous hostile environment that deprives children of the ability to make intelligent and meaningful choices about the path of their lives.

In and around the housing projects in Brownsville young boys and now girls are forced to group together for their daily survival.  Going to the store to run an errand, traveling to school or venturing outside of one's own housing project will invite violence and even death.   For children who live in this environment, the fear of being a victim of violence is always present.   See, "*The Playground Gangs of Brownsville, - Woo Cho Bang, Bang,*" *Id*.

Normal everyday social events such as basketball games or parties often erupt into violence where physical harm and death is always a looming possibility.  It is out of this experience, that Dwayne Stone and other young boys view their future and group together for survival.  It is virtually impossible for young African American boys to make it out of these hellish environments without the sturdy loving hand of a father role model to guide them.

In his article, "*The Playground Gangs of Brownsville,*" the author Eric Konisberg interviews, Lieutenant David Glassberg, who ran the New York City Police Departments's Juvenile Robbery Intervention Program in Brownsville from 2007 until this year. Lieutenant Glassberg observes,

18

> "The most surprising thing about Brownsville's endless waves of killing is that many of the victims, along with many of the perpetrators, are children.   The kids keep getting younger—they start at 12 and 13.  The youth gangs are the reason the 73 [precinct] is at the top."

Both articles provide insight into the lives of children, who for generations are born and raised into a lawless environment, just a subway ride away from the cosmopolitan affluence of Manhattan.  Each article provides insight into the deadly environment and the mind set of the children that reside therein.

> There is not much else to do.  Brownsville is just eight miles east of Manhattan's southern tip — the Freedom Tower shimmers beyond the housing projects.   But it can feel like a different city. Brownsville is one of New York's poorest neighborhoods, with nearly 40 percent of people living below the poverty line. It has been that way for decades, even as lawmakers tried one anti-poverty program after another.  Nearly half of those 16 and older are not in the labor force; thousands more are looking for work and unable to find it. A steady barrage of violence punctuates their idle hours.  There were 72 shootings last year and 15 murders — in an area spanning about two square miles that many people never leave.

See, "*On The Brink in Brownsville*," by Mosi Secret.   During the interviews, one young teen boasts that he "liked watching playground fights, trading blows himself and running back and forth in the melees."   The teen said that early in the summer, he fought a boy near the track in front of the elementary school and recollects "that day, bro, when we had that brawl right here?" he told a friend later. "I had him under the car.  Like, literally under the car." The young teen tells of another time, his group of friends beat up a boy on the other side of the neighborhood.

The fights were part of a territorial feud, not over money or drugs but simply turf — one handful of housing developments versus another.   A few years ago, one of the young teen's friends was killed by boys from the rival group.   The young teen told the author that the killing was the first — the one that hardened the rivalry.   However, the author of On the Brink of Brownsville points out that "wiser people with longer memories know better."

The author Mosi Secret follows the lives of two young boys from the Marcus Garvey Housing Complex who are caught up  in a fierce and deadly struggle with those from the

Tilden housing projects, just as Dwayne Stone and Jamal Washington were just a generation earlier.  The Tilden housing projects  were just blocks from where they were walking, with borders marking the enemy territory.   The boys who lived Tilden, along with the boys living in the Marcus Garvey Houses, called themselves the Hood Starz. Boys from the Langston Hughes Houses, the Seth Low Houses, the Brownsville Houses and the Van Dyke Houses called themselves the Wave Gang.

As they walk the neighborhood together, the boys the discuss the Tilden and Marcus Garvey projects with mix of pride and fear.

> "This is the realest hood, though.   You got other places that's live wires," (naming housing developments) .   Tilden is just a war zone.   The police could not stop the violence.  They already did what they can do. It's never going to stop .  They growing up from little kids, and it keeps going . . . from generation to generation to generation ."

These young teens understand that society has left them on their own, to fend for themselves and navigate their childhood and teen years through a dangerous and hostile environment.   Absent from the collective memory, and apart from the recent horrific murders, which include a 1-year-old boy, Antiq Hennis, who was shot in the head while his parents were pushing him in his stroller, is any memory whatsoever of the death of Jamal Washington which took place in 2000 and the mandatory life sentence imposed upon Dwayne Stone by this court in 2008.

What remains from a generation ago, however, are the same miserable public housing projects, the same level of poverty, same level of murder and violence committed by teenagers against other teenagers and the same level of despair and hopelessness.  See, "*Death and Life in Brownsville*," by Sana Beg, May 9, 2003 **http://projectwordsworth.com/death-and-life-brownsville/**; See also, "*Report on Violence During Adolescents and Young Adults*," published by SUNY Downstate Medical Center, by John C. LaRosa, MD, 2005.    In the past two years alone, there have been at least 15 murders and 40 victims wounded from gun fire in Brownsville.  These were the very same conditions that Dwayne Stone and Jamal Washington were born into and raised.   These are the very same circumstances that contributed to and influenced the derailment of the life of a once promising young boy, who now stands before the court for reconsideration of his previously imposed sentence.

It seems contrary to our nation's concept of justice and fairness that a sentencing court would not to consider and give effect to these powerful forces, even where these children grow up and participate in terrible crimes including murder.  The Supreme Court

20

itself has now recognized that many youth are simply unable to extract themselves from the the dire circumstances in which they are born and raised.  The Supreme Court has also recognized and empowered sentencing courts to consider the family circumstances in the children are born and the influences their families and environment upon their development and criminal conduct and to consider the offender's potential for rehabilitation and redemption.

Contrary to what was said at the time of his initial sentencing in 2008, there is much to be said about Dwayne Stone, along with the fact that this court now has the discretion to make a difference in sentencing.   It was without contradiction, that Dwayne Stone was born to teenaged parents who singularly and in combination derailed his life, before he had a chance.   It was Dwayne Stone, Sr., who took his 11 year old son into the streets to toughen him up to the world of drug dealing and violence.   Dwayne Stone, Sr., now rejects his decision but the damage has been done.  It without contradiction, that Dwayne Stone, Jr., had what musician and cultural laureate Rashaad Roland Kirk referred to as some "bright moments" along his young life path,  where members of the community saw his potential and hoped from the best.   However, the confluence of negative risk factors present in one of our nation's worst urban neighborhoods, coupled with the dysfunction of his parents, simply outweighed any real chance for Dwayne Stone, Jr.'s success.

The Supreme Court is absolutely correct in its observation that these factors must be considered in imposing sentences upon juveniles who engage in criminal conduct as the direct result of the confluence of circumstances which impacted their lives.  The young African American boys; like Dwayne Stone, who have the misfortune to be born and raised in the Brownsville section of Brooklyn without the presence and influence of strong parents, are subject to a staggering probability that their lives will be doomed.   There plight and life story must be brought forward at a time when they face the possibility of life in prison.

In a recent case in the United States District Court for the Eastern District of New York, the Hon. Jack B. Weinstein authored a brilliant opinion which analyzed the impact that overwhelming negative risk factors present in Brooklyn had on the lives of the young men before the court for sentencing.  The court's 57 page opinion, complete with statistics on deprivation of education, employment opportunity, poverty, drugs and violence over the past 40 years, examined how those conditions combined and served to derail the lives of each of the young men before the court for sentencing.

Judge Weinstein astutely observed:

> Had the defendants been raised by cohesive, adequate families,
> most of the difficulties they encountered would probably never

have come to pass.  Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth.   Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense. That the defendants were born into circumstances without such support is at the center of this tragedy.

*United States v. Bannister*, 786 F.Supp.2d 617 (EDNY 2011).   The thoughtful observations and wisdom of Judge Weinstein, who has served the federal judiciary in the Eastern District of New York with distinction for 47 years, and who has also presided over thousands of proceedings involving the staggering negative risk factors present in Brownsville/East New York during Dwayne Stone's childhood and teen years, should be given serious consideration when making a determination whether a sentence less than life is warranted.

Rehabilitation and Redemption

At the core of the Supreme Court's decision in *Miller* is the reiteration that the Eighth Amendment requires a sentencing court to consider the likelihood of rehabilitation for the terrible crimes committed by an offender  prior to reaching his or her 18th birthday.  As stated above, in this case on the conducted committed prior to his 18th birthday, Dwayne Stone faced a mandatory life sentence under count 13 to be followed by a mandatory consecutive sentence of 25 years.

In this case, a review of the life, history, background and present circumstances strongly indicates that Dwayne Stone is a young man capable of true redemption and that a sentence less than death is sufficient to punish him, while protecting the public from his future criminal conduct, along with the other sentencing goals of Congress.

In the poem "Mother To Son," by Langston Hughes, a mother gives advice to her son on how to go about life.  The woman who has had a tough life, describes her life as a torn up broken down stair case, with many turns.  Her life isn't rich and luxurious, and it has many obstacles and tribulations waiting to be overcome. "So, boy," she says to her son, ". . . don't turn back.  Don't set down on the steps 'cause you find it kinder hard. Don't you fall now- for I'se still goin', honey, I'se still climbin."   She tells her son "I'm still climbing

22

and so should you, even when times get hard.  She admonishes her son that life is "no crystal stair."

Dwayne Stone, was born to two dysfunctional teenage parents.   As a result, Dwayne Stone was not blessed with the gift of wisdom or the words of a loving parent or grandparents to guide and inspire him.   Instead, Dwayne Stone was emotionally and physically abused by his mother and corrupted into the culture of drugs by his father, who served 15 years in federal prison for drugs and murder.  The imposition of life sentence was a devastating blow to Dwayne Stone, who faced the prospect of spending the remainder of his natural life for his failures and poor choices as a teen and young adult made on the streets and later in connection with these proceedings.[9]

However, once removed from the influences of Brownsville, the potential and promise of Dwayne Stone began to emerge.  Dwayne Stone has made a positive adjustment to prison life.   Dwayne Stone has disavowed his prior gang affiliation and his entire life on the streets.   Although Dwayne Stone has had two incidents (tested positive for marijuana during his first month of detention on this case at the M.D.C. and a knife found in his cell at McCeary USP in 2010), the young man who once smoked 10 blunts per day and was the leader of a violent group of young men, has an excellent institutional record.  Other than within his first weeks of detention (which was residue in his system from his drug habits prior to arrest), Dwayne Stone has never tested positive for drugs and lives a drug/alcohol free life in the B.O.P.   In addition, once removed from the anger and bitterness of Brownsville, Dwayne Stone has had the opportunity for reflection and has found his core and center.   Dwayne Stone has not had a single physical fight or confrontation in the B.O.P. since his arrest in 2006.

Eight years in the penitentiary without a single fight for a young man, who once thrived on the violence of Brownsville, speaks volumes.   It speaks volumes about his true character and potential and also about the great human potential that is destroyed in urban ghettos such as Brownsville, year after year.   Dwayne Stone has not just managed to stay out of trouble in prison, instead he has taken upon the task of educating himself and seeking his redemption.

Included for the court's review are several certificates of achievements that Dwayne Stone has earned during his years in the penitentiary.    These certificates are important

---

[9]      Dwayne Stone turned down and rejected an opportunity to plead guilty to a plea agreement which contained a substantial prison sentence but which was less than life.   In addition, upon information and belief, several Dwayne Stone co-conspirators who each committed murder reached plea/cooperation agreements, have served prison time and have been returned to society.

because they were pursued and achieved by a young man who was serving a mandatory life sentence, without any hope of being released and returned to society.   Dwayne Stone decided to spend his prison time positively, learning and growing and finding his personal dignity in yet another difficult environment - *a federal penitentiary*.

Dwayne Stone wanted the court to be aware of his accomplishments and that he has potential as a human being; that he is much more than the angry, confused and bitter young man from Brownsville that once defiantly appeared before this court.  Given a meaningful opportunity, Dwayne Stone has the ability, talent, intelligence to become a man free the shackles of the ignorance that once consumed his life and that of his parents.

As a result of the Supreme Court's decision in *Miller*, this court is in a position to do what it believed it did not have the discretion to do in 2008.   This court can accomplish something that Dwayne Stone's parents and his community failed to do many years ago, that is to inspire hope into the life of a once deserving boy, whose life was derailed from the start.

Over the past 20 plus years, I have had the occasion to represent young defendants within the Eastern District of New York on cases involving the distribution of narcotics accompanied by high levels of seemingly mindless acts of violence, including murder. Most, if not all the defendants, have fit the profile of Dwayne Stone, born to dysfuctional often drug addicted parents and raised under horrific conditions, which led to their personal derailment and a life in criminal activity.  Were this court to impose the following substantial sentence at variance with the guidelines: 10 years on counts 1, 2, 3 11 and 12 to run concurrent with each other and with 41 months on count 22; to be followed by 5 years consecutive on count 4 and 25 years consecutive on count 13 such a sentence would be sufficient but not greater than necessary to reach to sentencing goals of Congress, and would comply with Eighth Amendment concerns discussed by the Supreme Court in *Miller* and provide Dwayne Stone with the hope of returning to society several decades from now to fulfill the promise that he was deprived us since his birth.

## VI.  Conclusion

The individual family history of Dwayne Stone, along with profound community risk factors combine to mitigate against the imposition of a life sentence in this case. Dwayne Stone's life is yet another compelling example of how negative environmental input can derail one's life path.  Dwayne Stone is a young man whose parents' problems converged to hinder his emotional development and ultimately served to derail his life. The presence of compelling risk factors in his formative and adolescent years foretold his involvement in the criminal justice system.  The conditions and circumstances in which Dwayne Stone was raised negatively impacted his judgment, insight and ability to reason.

Dwayne Stone's personal history and background is indicative of an individual who can make an adjustment in behavior through a period of incarceration, and can be successfully rehabilitated.

It is for those reasons, that Dwayne Stone prays that this court impose a sentence less than life in prison.

Respectfully,

*Anthony L. Ricco*

Anthony L. Ricco

ALR/jh
cc:  A.U.S.A.  Jason Jones (By ECF and email)