UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DWAYNE STONE,

      Petitioner

  - against -        Docket. No.  *11-CV-2763 (ILG)*
              Docket. No. 05 Cr. 401 (ILG)

UNITED STATES OF AMERICA,

       Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SUPPLEMENTAL SENTENCING MEMORANDUM
ON BEHALF OF DWAYNE STONE  (LETTER)**


Anthony L. Ricco, Esq.
Attorney For Dwayne Stone
20 Vesey Street, Suite 400
New York, New York 10007
(212) 791-3919


Steven Z. Legon, Esq.
Of Counsel

# ANTHONY L. RICCO

*Attorney At Law*

20 VESEY STREET, SUITE 400

NEW YORK, NEW YORK 10007

TEL. (212) 791-3919  FAX. (212) 791-3940

Steven Z. Legon
Of Counsel

July 25, 2014

**FILED BY E.C.F.**

Hon. I. Leo Glasser
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York   11201

> Re:    ***Dwayne Stone v.  United States of America***,
>         Docket. No. *11-CV-2763 (ILG)* and  05 Cr. 401 (ILG)

Dear Judge Glasser:

This letter is submitted as Dwayne Stone's supplement sentencing memorandum in connection with the re-sentencing which is presently scheduled for August 11, 2014. This supplemental sentencing memorandum includes:  (1) a comprehensive socio-profile that was prepared during the pre-death penalty authorization stage of this case (2006 Mitigation Report), and (2) Certificates of Achievements earned by Dwayne Stone during his incarceration with the Bureau of Prisons (BOP).

## I.   The 2006 Mitigation Report

Since Dwayne Stone was charged with a violation of 18 U.S.C. § 1959(a)(1), a death eligible offense, during the early pre-trial stages of this case he faced the possibility that the Attorney General would authorize the death penalty.   As a result and in accordance with the Second  Circuit and EDNY capital case protocols, this court appointed Dwayne Stone learned counsel, along with various experts, to conduct a comprehensive mitigation

investigation pursuant to 18 U.S.C. §§ 3005 and 3006.[1]   An extensive mitigation investigation was, in fact, conducted and memorialized in a report dated January 27, 2006 (hereinafter 2006 Mitigation Report).[2]   The 2006 Mitigation Report provides a profile on the life of Dwayne Stone as told from the perspective of those family, friends and neighbors who knew him as a boy and young teen and who, themselves, endured life living in the Brownsville section of Brooklyn.

Necessity of Filing the 2006 Mitigation Report

The Supreme Court has repeatedly reminded us that in order to give the sentencing regime its constitutional validity, at the time of sentencing, the focus must be upon the offender as an individual and his life narrative.   In order to consider an offender as an individual it is not adequate to simply set forth a *pro forma* chronology or index of the offender's life path.   Rather, 18 U.S.C. § 3553(a), inspires the court to take a hard look at the meaning and interrelation of the events that comprise an individual's life.   This type of in-depth view of the offender is rarely set forth in the Presentence Investigation Report. The reasons are complicated.   In some instances the enormity of the crimes charged over shadow and outweigh the consideration of the factors that led the offender to the commission of the charged offense.   In other instances, a lack of familiarity and comprehension of the forces and influences present in the life of the offender, prevent a meaningful evaluation of the "*nature of the offense*" and "*history and characteristics of the defendant.*"

All to often the nature and circumstances of the offense and world faced by the offender are viewed from the comfort and distance of the courtroom and from the outside looking in.   The 2006 Mitigation Report has been provided so that the court can stand in the  footprints of Dwayne Stone (and the victims in this case) and view the nature of the offense and his characteristics and history, from the stand point of his friends and

---

[1]      The Judicial Conference of the Administrative Office of the United States Courts has adopted a policy for the appointment of learned counsel in capital cases.  See, Section 6.01(A)(1) of the Guide to Judiciary Policies and Procedures.   The Board of Judges of the Eastern District has adopted the policy and procedures for the appointment of learned counsel in capital cases consistent with Section 6.01(A)(1) of the Guide to Judiciary Policies and Procedures.   See, The Revised CJA Plan of the United States District Court Eastern District of New York, Pursuant to the Criminal Justice Act of 1964 (18 U.S.C. § 3006A, as amended). **https://www.nyed.uscourts.gov/sites/default/files/local_rules**; and Second Circuit CJA Policy and Procedure Manual;   **http://www.ca2.uscourts.gov/clerk/attorneys/cja_manual.html**.

[2]      Initially, the defense intended to file the 2006 Mitigation Report under sealed. However, after a review of the relevant case authority and further review of the report, it is being filed herewith on E.C.F. as a public document.

neighbors who knew him and observed his descent into embracing the world of violence into which he and the victims were born.   It is from this stand point that the court has a more enlightened and thereby complete view of the offender, the nature and circumstances of the offense of conviction and the potential, if any, for rehabilitation and redemption.

That Dwayne Stone lacked the parental guidance, and the presence of positive influences in his youth, foretold that he would not overcome the debilitating circumstances that he was born into in Brownsville.   As pointed out by Judge Weinstein in *United States v. Bannister*, children who are born to responsible parents are blessed with an opportunity to survive the conditions of the type present in Brownsville.   Responsible parents in such environments often work hard to instill in their children hope for the future, through a love for the promise of education and also by providing their children with an accurate historical assessment of why families are forced to live in such deplorable conditions in the first place.   Oftentimes, these parents are not able to give their children material advantages but they are able to give them character, hope and courage to aspire beyond the conditions they were born into.

Dwayne Stone, Jr., never had such dedicated and insightful parents.   Instead, he was born to the hands of a pimp, a drug dealer and a thug, who eventually committed murder to secure his place in the drug world.   Instead, equipping his son which courage, pride and hope for the future, he provided his son with fancy sneakers, fashionable clothing, and an entry into a world that would ultimately serve to destroy his life.   The idea that Dwayne Stone, Sr., is today  a freeman, living in a society where his son faces the remainder of his life in prison, is spiritually and morally offensive.   It is a reflection of a high order of moral corruption and the destruction of social order and responsibility.

The Presentence Investigation Report presents the life narrative of Dwayne Stone from the perspective of a government agency, with little, if any, depth of the impact of the lack of parental guidance combined with the staggering conditions that generations of chronic community neglect has on the lives of the offenders and or the victims.

This 2006 Mitigation Report has been provided, because of the important need to include the insight of those who witnessed, first hand, the destruction of Brownsville and the impact on the lives of its children (as victim-defendants).    In my professional experience, it is rare that these voices are included in sentencing proceedings and, as a result, an important aspect of the offenders' background and history is never accurately considered.

The legislative mantra is 18 U.S.C. 3553 is brilliant in every respect, it states, *inter alia*, that the court is to consider the history and character of the offender, along with the circumstances of the offense; consider the need to promote respect for the law and to protect society from the future crimes of the defendant and to provide for needed rehabilitation of the offender and impose a sentence that is sufficient but not greater than necessary to promote these goals.   In addition, Congress stated that shall be no limitation

placed upon the information concerning the background and character of the offender in consideration of imposing an appropriate sentence. See, 18 U.S.C. § 3661.

All to often in sentencing proceedings across our nation, the only voice that is heard and the only perspective that is advanced is that of government which focuses upon promoting respect for the law and incapacitating the convicted defendant. The sentencing submission by Dwayne Stone is lengthy, it covers much ground including the ugly history of why a ghetto like Brownsville exist in the first place. This detailed information has been submitted to make clear that Dwayne Stone and Jamal Washington hardly created the staggering circumstances that influenced the destruction of their lives and the lives of their parents, in pandemic numbers.

The individuals interviewed by Carmeta Albarus, when speaking of Dwayne Stone, tell of a once quiet, respectful boy, who started life full of promise and how he, and other good boys, were corrupted by the violence into which they were born and raised without the strong hand and influence of parenting. These friends and neighbors tell of the conditions from over well over twenty years ago. The New York Times and New York Magazine articles referenced in our initial sentencing submission, which interview young teens living in Brownsville today, informs us that the notwithstanding thousands of arrests and prosecutions over the past twenty years and the imposition of long prison sentences, including mandatory life sentences, the horrific social conditions resulting in perpetual violence remains and that the law enforcement concept of setting an example has been lost to succeeding generation of children born into the malaise of poverty and neglect endemic to Brownsville.

Hope was once the mantra of people living in poverty. It was the driving spiritual force which helped them overcome seemingly impossible barriers. In today's world the concept of hope has been become lost to those, even good meaning people, who are simply frustrated and overwhelmed by the enormity of the destruction of our youth.

In *Miller v. Alabama*, Judge Kagan, writing for the majority, breathed life back into the concept of hope for the future when sentencing young offenders by reminding us that actions taking by them, even engaged in murder, takes places during a transitory time period in their lives and that before imposing the harshest of sentences, the court must give the idea of rehabilitation and redemption (hope) meaningful consideration.

The 2006 Mitigation Report provides insight into where Dwayne Stone started in life, and a meaningful look at the forces which served to derail his life and contributed to his participation in acts of violence and murder. On the basis of this information, coupled with his conduct in prison, this court is in a more informed position as to whether the crimes Dwayne Stone participated reflected a transitory period in his life and, in turn, whether he possesses the potential for rehabilitated and redemption.

4

Submission of the Bureau of Prison Records

The Certificates of Achievements earned by Dwayne Stone during his years of incarceration in the Bureau of Prisons have been supplied because they provide the court with information on how Dwayne Stone conducts himself, when free of what the Supreme Court called a transitory period and free of the devastating influences of Brownsville. Dwayne Stone who has not been involved in as much as a fist fight, has reclaimed the spirit that he possessed when he was a small boy many years ago.   Dwayne Stone has taken every single course and program available to improve himself both academically and spiritually.

Based upon the information provided now, information with played no role in the prior sentencing proceeding, along with the insight provided by Supreme Court in *Miller* on how to view the conduct of offenders for conduct committed prior to reaching the age of 18, Dwayne Stone humbly requests an opportunity to have precious hope restored to his life.  Dwayne Stone requests that this court grant him an opportunity to one day return to society and resume his life as a free man, although many decades from now.

## II.  Conclusion

The individual family history of Dwayne Stone, along with profound community risk factors combine to mitigate against the imposition of a life sentence in this case. Dwayne Stone's life is yet another compelling example of how negative environmental input can derail one's life path.  Dwayne Stone started life as a boy whose parents' problems converged to hinder his emotional development and ultimately served to derail his life.  The presence of compelling risk factors in his formative and adolescent years foretold his involvement in the criminal justice system.  The conditions and circumstances in which Dwayne Stone was raised negatively impacted his judgment, insight and ability to reason in an at risk, hostile environment called Brownsville.  Dwayne Stone's personal history and background is indicative of an individual who can make an adjustment in behavior through a period of incarceration, and can be successfully rehabilitated.

It is for those reasons, that Dwayne Stone prays that this court impose a sentence less than life in prison.

Respectfully,

*Anthony L. Ricco*

Anthony L. Ricco

ALR/jh
cc:  A.U.S.A.  Jason Jones (By ECF and email)

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

January 27, 2006

Avraham Moskowitz, Esq.
Moskowitz & Book
1372 Broadway
14th Floor
New York, NY 10018

Dear Mr. Moskowitz

   In accordance with your request, below is a preliminary psychosocial report on behalf of your client Dwayne Stone.   In preparing the report the following was done:

1)   Interviews:
     Dwayne Stone, client
     Denise Richardson, mother
     Dwayne Stone Sr., father
     Christina Settle, son's mother
     Andre Rozier, mother's friend
     Fabia Miles, teacher
     Michelle Bostick, cousin
     Melvin Beverly, preacher at Little Rock Baptist Church
     Talitha Smalls, aunt
     Nina Irons, cousin
     Saphronia Halley, cousin
     Senator John Sampson, New York State senator
     Jimmy O' Pharrow, gym owner

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

>    Greg (LNU), boxing trainer
>    Raheim Miles, friend
>    Sadaku Powell, boxer
>    Curtis Stevens. boxer
>    Earl Richardson, boxing manager
>    Charles Richardson, mother's ex-husband
>    Katherine Allen, mother's godmother
>    Derrell Wilson, cousin

2)    Documents Reviewed:
>    School transcripts
>    Special Education records
>    Bureau of Prison records
>    Medical Records from Kings county Hospital
>    Medicaid payment records

## Introduction

Dwayne Stone is a twenty-three year old African American male incarcerated at Metropolitan Detention Center in Brooklyn.    He awaits trial on murder and other charges.    Dwayne presents as very concerned about the impact that his incarceration might have on his three year old son, Divine Anthony Stone.    He seems to have a genuine fatherly attachment to his son, as well as a concern that he needs to protect his son against certain risk factors that he faced in childhood.

## Family History

Dwayne Stone was born on November 6, 1982 to Dwayne Stone Sr. and Denise Richardson in Brooklyn, New York.    He is the first child born to his mother and the only child from the union of his mother and father.    He has two paternal siblings, namely Lashay Campbell (age 20) and Tyree Stone (age 10).    He also has five maternal siblings, namely Chanise and Chaniqua Richardson (twins, age 17), Timothy Johnson, Jr. (age 13), Tag O'Neal (age 8), and Denisha O'Neal (age 6).    Currently, Dwayne's father,

2

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

> Greg (LNU), boxing trainer
> Raheim Miles, friend
> Sadaku Powell, boxer
> Curtis Stevens, boxer
> Earl Richardson, boxing manager
> Charles Richardson, mother's ex-husband
> Katherine Allen, mother's godmother
> Derrell Wilson, cousin

2)   Documents Reviewed:
     School transcripts
     Special Education records
     Bureau of Prison records
     Medical Records from Kings county Hospital
     Medicaid payment records

### Introduction

Dwayne Stone is a twenty-three year old African American male incarcerated at Metropolitan Detention Center in Brooklyn.    He awaits trial on murder and other charges.    Dwayne presents as very concerned about the impact that his incarceration might have on his three year old son, Divine Anthony Stone.    He seems to have a genuine fatherly attachment to his son, as well as a concern that he needs to protect his son against certain risk factors that he faced in childhood.

### Family History

Dwayne Stone was born on November 6, 1982 to Dwayne Stone Sr. and Denise Richardson in Brooklyn, New York.   He is the first child born to his mother and the only child from the union of his mother and father.   He has two paternal siblings, namely Lashay Campbell (age 20) and Tyree Stone (age 10).    He also has five maternal siblings, namely Chanise and Chaniqua Richardson (twins, age 17), Timothy Johnson, Jr. (age 13), Tag O'Neal (age 8), and Denisha O'Neal (age 6).   Currently, Dwayne's father,

2

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

Stone Sr., is imprisoned at the Federal Correctional Institution at Edgefield, South Carolina. The history of both Dwayne's parents is one of instability and conflict, which has had an adverse impact on Dwayne's psychosocial development.

Stone Sr. (Dwayne's father), although incarcerated, did agree to an interview wherein he gave details of his social history. He was born on April 7, 1963 to Richard King and Mary Stone in Brooklyn. Both parents are deceased. He is the older of two children born to his mother. His younger sibling Donnay Stone currently lives in Charlotte, South Carolina. His impression of his father was of a "smooth, good dude, sharp dresser but no drugs, and more like a friend to him than a father."

According to Stone Sr., his parents separated when he was a young child. He recalled that his mother left for California when he was five years old. Thus, he was raised by his maternal grandparents, Agnes and Thomas Stone. He said that his grandparents lived in the Cypress Hills housing projects and, at that time, there was very little crime in the community. He could not recall his grandfather ever working but, he said, his grandfather was well respected in the community. He said that his grandfather received welfare benefits and Social Security Income. He also recalled that his grandfather "ruled the home and the housing project with an iron fist." He noted that his grandfather had a gun and a dog, and no one messed with his grandfather. According to Stone Sr., even the cops respected his grandfather.

Stone Sr. said that his grandmother Agnes was the disciplinarian in the home as she was very strict. He said that he had many aunts and uncles who were in and out of the home. He recalled that his uncles were into the streets and he noticed that the community looked up to them. He remarked that he also looked up to his uncles. In recalling the many years that his mother was away, he remarked that both he and his brother were well treated by his grandparents. However, neither he nor his brother ever visited his mother in California. He recalled that his grandmother and aunts would visit his mother, but not him. When asked the reason for his mother's move to California, he said that she went there for job opportunities. In the eight years that she was gone, she

3

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

never visited him in New York.

Stone Sr. was thirteen years old when his mother returned to New York. She stayed for a short while at his grandparents' home but eventually got her own place. For a while he went back and forth between both homes but, by observing his grandfather and uncles, Stone Sr. grew wary of his grandmother's strict discipline and eventually went to live with his mother, where discipline was lax.

He indicated that the looser supervision at his mother's home had an influence on his behavior. He had very little motivation to attend school and, although he slept at his mother's home, he would visit the projects everyday. He said that he worked at a supermarket for about eighteen months, but he quit because he felt underpaid. At age sixteen, he was getting into street activities. At around that age he also met a paternal sister, Octavia, who was into drugs and was subsequently murdered. He reported that he got in trouble with the law at age seventeen, but he "beat the case at trial." At age eighteen, he met Denise Richardson (Dwayne's mother), who was then sixteen years old.

Denise Richardson, born October 19, 1963, was the second of three children born to her mother Betty Pinkett. The other children born to her mother were Veronica (DOB 10/22/61) and Spencer (deceased). Denise recalled that her brother Spencer died when he was two or three years old, due to a drag racing accident. She has memories of the drag racer crashing into her brother and dismembering his tiny body. She remarked that Spencer's death traumatized her mother and caused her mother to become very strict and protective. As she grew older, she found it difficult to cope with her mother's strict rules and demands. While she felt that her mother tried to give her a "normal upbringing," which included church, she noted that her mother was also abusive. She explained that her mother beat her for minor infractions.

Denise suggested that her family history affected her childhood. She related that her mother Betty had a very tragic birth. Betty's mother died while giving birth to her and her twin sister. Betty was the only one who survived birth as her twin also died in

4

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

the delivery room. Betty was then raised by Saphronia and Jim Halley, her biological father. Betty grew up believing that Saphronia was her biological mother and she thus had a close bond with Saphronia; however, on Betty's wedding day, she learned that she was not Saphronia's biological child. It was Saphronia who informed Betty of the truth, as she did not want Betty to find out from family members. According to Denise, Saphronia also did not want family members to reveal that Jim Halley (Betty's father) was having an affair with Saphronia while Betty's mother was pregnant.

Denise paints a woeful picture of her grandfather, Jim Halley, and other paternal relatives. She reported that her grandfather Jim was addicted to drugs and alcohol. She recalled that her uncles were also drinkers. She said that her mother and father eventually moved to New York, where she was born. She reported that her parents' later separated, which traumatized her emotionally. She blamed her mother for the departure of her father. She was extremely troubled by her father's departure because she wanted to bond with her father.

Denise's emotional trauma may have contributed to problems in school. She reported that she attended Erasmus High School, but was expelled in her senior year because of a disciplinary infraction. She remarked that the school had a strict disciplinary code, which extended to what songs could be sung at the school's talent show. She said she was expelled from school because she and her friends performed a song that was forbidden by the school. She said that Erasmus High was a gifted school at the time, and she was doing well there, but the expulsion meant that she did not get to graduate.

Denise said she was "blessed to meet Stone Sr." Her need for support influenced her initial impression of Stone Sr., especially after she became pregnant with Dwayne by him. At the time of her pregnancy, Denise's relationship with her mother had deteriorated to the point where she was forced to leave home. She was thus overjoyed that Stone Sr. and his family accepted her into their home.

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

Of note is that around the time Stone Sr. and Denise began dating, Mary Stone, Stone Sr.'s mother, was very ill with terminal cancer. Stone Sr. recalled the trauma of seeing his mother's condition worsen before his eyes. He recalled that her body racked with pain and there was nothing that could be done to help her. He could not stand to be around her. His feelings included anger towards her for leaving him for so many years, then dying before he could get a chance to bond with her. He also expressed frustration that he did not show his mother the sympathy he felt he should have been able to show her. He found it difficult to visit her in the hospital. He recalled that the night before she died, she asked that he come to see her. His aunt implored him to go and he did. The next day she died. Denise was three months pregnant with Dwayne at the time of Mary Stone's death.

According to Stone Sr., he could not cry at his mother's funeral. He said that he could not feel anything. "I had to be strong for my younger brother" he remarked. He said, however, that his attitude took a turn for the worst and he got into the streets more. He said he did everything he could to numb the pain of losing his mother. His behavior affected his relationship with Denise and he recalled that he was abusive towards her. According to Denise, Stone Sr. was a local thug who ran the streets a lot but, initially, he was very kind and supportive towards her. However, around the time of Dwayne's birth, she noticed a drastic change in Stone Sr.'s attitude. She recalled that Stone Sr. became abusive and the abuse was so excessive that she decided to leave.

In light of Stone Sr.'s abusive behavior, Denise felt a renewed longing to be with her father. About a year after Dwayne's birth, Denise left Dwayne with his paternal great grandfather, Thomas, and went to live with her father in New Jersey. She stated that she was used to spending summers with her father, but he never showed much interest in seeing her. Even as she went to stay with her father one more time, she was troubled by the many summer days she wondered if her father really loved her. She said that she was so in need of a relationship with her father that she always forgave him. Again, however, her pursuit of her father left her feeling disillusioned. She discovered that her father, like Stone Sr., was a violent man who abused his wife and step children. She

6

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

recalled that when she saw her father beating on his wife, Chi Chi, she told him to stop. She reported that her father responded by threatening to abuse her also. She was so angry with her father that she fought him and left his house.

When Denise returned to New York, Dwayne was two years old and lacking sustained contact with her. Denise reported that she went to live with her mother, but she did not take custody of Dwayne. She recalled that Dwayne's great grandfather, Thomas Stone, wanted her to leave Dwayne with him and so she did. This arrangement lasted for about two more years, during which time Denise limited her role in Dwayne's life to that of a visiting parent. She thought that Thomas would be a good influence, and that Dwayne would benefit from Thomas' experience. She reported that Thomas was a veteran and had served in the military during World War I and II. She reported also that Thomas was very politically conscious and was once a member of the Black Panther Movement.

Unfortunately, Dwayne was also exposed to the negative influence of his father, Stone Sr. Denise reported that Stone Sr. tried to make Dwayne into his "little man." She recalled Stone Sr. telling Dwayne to shut up and that men don't cry. This was disconcerting to her, as Stone Sr. was a gangster and seemed willing to mold Dwayne into that image. She remarked that Stone Sr. would bring his street associates to the house and Dwayne would be exposed to their presence and conversation. Stone Sr. has acknowledged that he tried to make Dwayne into his little man and that his behavior would have had a negative impact on Dwayne. His behavior, he admitted, included several fights with Denise, and that these incidents were bad for Dwayne.

Stone Sr. abused Denise even after she moved back to her mother. On one occasion, Denise said, Stone Sr. saw her on the street and became verbally and physically abusive. She said that she went for a knife and returned to the scene, whereupon Stone Sr. proceeded to attack her again. She then stabbed him a number of times and he almost died. She recalled another incident whereby Stone Sr. saw her at a party and attacked her. She recalled that there was a snow storm that night and Stone Sr. dragged her

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

through the snow while punching and kicking her.    She said that because of Stone Sr.'s constant abuse, she started defending herself.

### Early Childhood

Dwayne's early childhood was affected by the violent behavior of his parents and their individually unstable lifestyle.    According to Denise, Dwayne was present for almost all the fights she had with his father.    Denise said that she and Stone Sr. got into arguments about twice per week, and that at least twice per month the arguments escalated into physical fights.    This was within the first four years of Dwayne's life.

Dwayne was close to the verbal and physical conflicts.    On one occasion, according to Denise, Dwayne was caught in the midst of a fight wherein his father was punching and kicking her.  She said that little Dwayne cried and screamed so much that his great grandfather, Thomas, had to take hold of him.    She said that Dwayne shied away from both parents after the fights and he was not close to either parent.    He was closer to Thomas who was protective and caring.

As was noted earlier, after the failed attempt to reunite with her father, it was convenient for Denise to leave Dwayne with Thomas.  She was in an unstable period of her life and still trying to find some direction.  She then started working, and also attended classes at the Royal Business Institute.  She said she attended the school in 1985/1986, when Dwayne was three years old.    She reported that she visited Dwayne regularly and tried to maintain a bond with him.  However, she suggested that her incapacity to care for Dwayne adequately led to conflict that affected Dwayne's young life.  For instance, her mother admonished her for not taking custody of Dwayne, and Dwayne became a subject of dispute with her mother.  She said that her mother often expressed disgust that Dwayne was left in the care of his gangster father and the elderly Thomas.    In February 1987, Denise heeded her mother's admonition and took Dwayne to live with her and her mother.    He was four years old when she took him.  About two months later, his great grandfather Thomas died.

8

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

At four years old, Dwayne was reliant on other parent figures to bond with him. He recalled having a close relationship with his great grandfather Thomas. His impression of Thomas was of a "mean man", but one who was never hard on him. While Dwayne indicated that he was responsive to parental figures in his life, he suggested that relating to his mother was difficult. Katherine Allen, Denise's godmother opined that Denise could not affectively parent her children because she was constantly pregnant, yet always wanted to go out. Additionally, Dwayne was often saddled with the responsibility of caring for the younger ones while Denise went out.

Denise reported that she did have a problem relating to Dwayne because of her troubled relationship with her parents. Dwayne was not fully aware of Denise's troubled relationship with her father and other males, but this seemed to have affected her ability to bond with Dwayne. Denise reported that although she never had drug or alcohol problems, "most of her anger is towards men." Dwayne's early exposure informed him that it was easier relating to other adults than to his mother. This observation extended to men who were in relationships with his mother.

In April 1987, his mother married Charles Richardson and moved into an apartment at Riverdale Towers. Dwayne developed an attachment to Charles and accepted him as a stepfather. Dwayne felt he was part of a family when Charles was around. He noted that Charles wanted a son and so Charles bonded with him. Charles bought gifts for him and took him to the park and to Coney Island. Charles brought a sense of fun into the home by having cook outs and other family activities.

To Dwayne's dismay, he noticed that his mother's behavior was leading to the break-up of the family. The problems in the home seemed to emerge after his sisters, Chanise and Chaniqua, were born to Charles and his mother on January 28, 1988. Around that time, Dwayne realized that his mother's attitude changed towards Charles. He recalled that Charles treated Denise well, but to no avail. "My mother is hard to please," Dwayne remarked. He noted that Charles was a passive and nice person. He noted that Denise was the aggressive one in the relationship and that she "wore the

9

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

pants." He recalled that he was in the third grade (around age seven or eight) when Charles left the home.

According to Denise, her relationship with Charles ended because she found out he was a "druggie." Denise gave the impression that she was oblivious to the impact her behavior and relationships were having on Dwayne. The implications of exposing Dwayne to such instability seemed to escape her, as she admitted that when she was with Charles, she "broke away from Dwayne for a time." She explained that she was undergoing stress and so Dwayne was neglected.

The neglect that Dwayne suffered manifested in physical abuse and in a failure of supervision. Denise admitted that she was so frustrated with her life that she penalized Dwayne. According to Denise, she was an abusive mother who beat Dwayne for every conceivable infraction. She indicated that of all her children, she treated Dwayne the worst. She suggested that one reason she treated Dwayne so badly was because he was a male child. Although Dwayne tries to minimize the abuse he received from his mother, he reported that he was beaten regularly. He reported that his mother also placed upon him various household tasks including the care of his younger sisters. If he did not fulfill a chore to her liking, she would beat him.

While stating that he was expected to take care of his sisters, Dwayne suggested that his mother did not have enough time to care for or supervise him. He indicated that his mother spent a lot of her time at work and on attempts at romantic relationships. Dwayne recalled that after his mother separated from her husband, Charles Richardson, she became involved with one Timothy Johnson Sr. His mother and Timothy had a son, Timothy Jr., in July 1992. Dwayne had a negative impression of Timothy, saying that Timothy was a bad father. Given his mother's neglect, Dwayne was even more susceptible to two significant factors that placed him at risk.

One factor was his learning problems, which began to manifest by the third grade. Fabia Miles, a teacher who knew Dwayne since he was six years old, said that Dwayne

10

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

was dyslexic. She reported that Dwayne and her children were playmates and she had a chance to observe him closely. Nevertheless, it took her a while before she recognized his learning problem. She recalled that Dwayne was about ten years old when she found out that he was dyslexic. Fabia noted that school was difficult for Dwayne as other students taunted him. From September 1987 through 1990, Dwayne was absent from school (PS 41K) a total of 267 days. This seems illustrative of a lack of supervision at home as well as declining interest in school. In January 1992, he was classified Learning Disabled and put in special education.

A second factor that placed Dwayne at risk was the negative influences that were pressed upon him in the community. These influences included drugs and gangs. Based on interviews conducted, Dwayne was not known as one of the kids who hung out on the streets or engaged in delinquent behavior. Fabia Miles stated that Dwayne was always respectful and mostly stayed in the house. Andre Rozier, who was like an uncle to Dwayne, said that Dwayne was not a troublemaker in childhood, but was instead a very nice kid. However, both Fabia and Andre reported that it was extremely hard for boys to escape the drug and gang influence in the community.

**Father's Influence**

The risk to Dwayne increased significantly because of Stone Sr.'s influence. From 1993 to 1997, Dwayne spent a lot of time with his father. Stone Sr. reported that after he was released from prison in 1993, he decided that he wanted to have a closer relationship with Dwayne. Stone Sr. explained that he patched up his differences with Denise and she was agreeable to him spending more time with Dwayne. According to Denise, she knew that Stone Sr. was a bad influence but she did not want to keep Dwayne away from him.

"At the time, I wanted to raise my son to be like me," Stone Sr. stated. Thus, he took Dwayne into the streets with him and exposed him to the street culture. Stone Sr. wanted Dwayne to see that people showed him respect on the streets. He admitted to exposing Dwayne to guns, and added that Dwayne also saw him "slap a few people

11

around." Dwayne was in awe of his father, Stone Sr. said. Interestingly, Stone Sr. was a fugitive while he was trying to build a relationship with Dwayne. He stated that he went to Charlotte, North Carolina, in order to escape the FBI, but he still allowed his children to visit him in Charlotte. Dwayne has memories of spending two or more summers as well as other holidays with his father in Charlotte.

Dwayne's best memory of his father is of a parent who gave him financial and emotional support. He hoped that his father would not be taken away from him. Around age twelve, Dwayne was very worried that he might have to live without his father. He believed that the Feds were following him to and from school in order to see if he would lead them to his father. He was both fearful and distraught. It was during this period, according to Dwayne, that he began smoking marijuana. Stone Sr. recalled that it was in 1995 that he went to Charlotte, NC and had changed his identity to evade capture. He recalled that the last name he used was Christopher Glenn. He had a barber shop and was enjoying a "slow and easy" life. He even had his children practicing the fake name. Stone Sr. was eventually caught and faced RICO charges that could have led to the death penalty. He reported that he was caught in Atlanta in October of 1997 and eventually accepted a plea that seemed to give him hope of rehabilitation and a possible return to society.

The loss of his father to the criminal justice system was a reminder to Dwayne of how fragile his family attachments were, and that these attachments led to disappointment. Stone Sr. recalled that he had promised Dwayne that Dwayne could come and live with him when he turned eighteen years old. After Stone Sr.'s arrest he was force to admit to Dwayne that he would be gone away for a very long time. This admission came when Dwayne visited him in jail and asked when he was coming home.

Dwayne reported that, as he came into adolescence, it was difficult to pinpoint a really secure period in his life. He indicated that there was a brief period when he bonded with his grandmother Betty and she would take him to church with her. He said, however, that he was no longer able go to church with his grandmother, because his

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

mother moved away from his grandmother's neighborhood.     He also indicated that the separation from his grandmother coincided with his mother's romantic involvements.

From 1994 to 1997, the period he was allowed to see his father, his mother was living with one Danny O'Neal, with whom she has two children (Tag and Denisha O'Neal).     Dwayne reported that Danny related to him more like a friend than as a father. Young Dwayne was impressed with Danny's persona and saw him as "cool."     He recalled that Danny was into the music business and managed R&B singers.          He observed that his mother was one of the R&B singers who Danny managed.  He also observed that Danny was a hustler who sold bootleg clothes.     He noted that Danny was eventually arrested for involvement in a credit card scam.

### Gang Affiliation

In numerous interviews conducted with residents of the community, it is clear that gang violence is endemic in Brownsville.  One such resident is Saphronia Halley, who is a twenty-six year-old cousin of Dwayne's, and shares the same name as the surrogate mother of Dwayne's maternal grandmother Betty.  Saphronia said that young boys join gangs out of necessity because of the gang warfare in the community.  She noted that the most popular gang in the area is the Bloods.  She said that whereas one time it was primarily boys being recruited, girls are now being pressured to join and are even carrying guns.

Jimmy O'Pharrow, (affectionately known as Jimmy O) an eighty year-old resident of Starrett City, said that he was born and raised in Brooklyn.  He stated that he lived in Brownsville until 1956, when he moved to Linden Boulevard, and then to Lavonia in Starrett City.  Although Jimmy O moved out of Brownsville, he reported that he maintained contact with the Brownsville and has witnessed Brownsville's transformation.       According to Jimmy O, from the 1940s through the 1960s many residents from the South moved to Brownsville and other communities for a better life. "Back then there was no Bloods or Crips, just old time gangsters in their own way," he said.  When asked to explain the phrase 'in their own way,' he said that the old time

13

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

gangsters were engaged in "gambling, shooting dice and drinking." He recalled that after a while these people began to move to Long Island for a better life and this brought about a transformation of the area. "In the '60s there were a lot of fires, blackouts and robberies. A lot of stores were burned out and people left and a lot of bad influence came in," he said. He saw a breakdown of structure in the community, and this decline prompted him to start the boxing gym. He felt that if he could get the young boys off the streets and into the gym, they would be less desirous of hanging around and getting into negative behavior.

Dwayne said that it was hard to avoid the influence of gangs in Brownsville and that he, like many other kids in the area, felt pressure to join a gang. He said that he joined the Folk Nation gang, but did not know then that the gang was a part of a nationwide system. He said that, prior to the introduction of the Folk Nation, the little boys in the projects had their little groups or cliques. There were names like the '440 Crew' or the '4 Side Boys' referring to their building numbers. According to Dwayne, membership in the Folk Nation grew out of those cliques or groups. He recalled that he learned about Folk Nation and urged to join the gang by a neighborhood guy named Biggie. Biggie had gone to a Job Corp in Kentucky, but afterwards returned to the projects in the 1990s.

Dwayne reported that Biggie, who lived down the hall from him, made the Folk Nation seem like an attractive alternative to the Bloods or the Crips. According to Dwayne, there was so much gang activity in the community that one felt joining a gang was a matter of survival. This sentiment is supported by Andre Rozier, referred to earlier and a director of the Starrett City Gym. Andre remarked that he was about thirty four years old when he saw the proliferation of gang activity in the community. He recalled that the gang proliferation followed the "Crack Epidemic", which he termed the poor man's fantasy. According to Andre, it seemed like everyone wanted to belong to a group. "No one wanted to be an individual," he said.

Senator John Sampson, State Senator whose constituency includes Brownsville,

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

said that there has been a proliferation of gangs in Brownsville. Senator Sampson, who has represented Brownsville for about ten years, sought to put the gang problem within the context of the communities needs. He emphasized that while there has been some improvement in economic and education activity within Brownsville, much more improvements were needed in order to counter the influence of the gangs. "If they had more opportunity there would be less need for gangs," Senator Sampson remarked. He said that a lot of young people join gangs because they wanted a family unit and also protection. Senator Sampson said that he has produced a pamphlet that he distributes to parents, because he wants them to know how to determine whether or not their children are in a gang.

Dwayne said that affiliation with the "Folk" gave him the opportunity to be affiliated with a group, thus getting protection, while not requiring him to have any external signs or symbols engraved on his body. He said that the absence of any external signs or tattoos was very important to him, because, if his mother had seen any obvious signs of gang membership, she would have 'killed him.' He said further that "Folk Nation was more like kinfolk, not blood related, but like family." Dwayne stated that it was not until he and his friend, Dino, were watching TV sometime in or around 1997/1998 that they realized that Folk Nation was part of a larger network. He said he was watching the HBO Special, *Banging in Little Rock*, which featured the Bloods, the Crips and Folk Nation. He and Dino went to the computer and researched Folk Nation and, according to him, saw that this was "Big." He said he began to question his membership and reported to Biggie what he had learned. He said that after he learned Folk Nation was more than just a group of guys from the neighborhood who were friends, he began to "grow out of it." He said that by the time he was seventeen he was into girls and not into Folk.

Denise reportedly was concerned about Dwayne's exposure to gangs in the community. Saphronia (Dwayne's cousin) corroborated that Denise was active in organizing community leaders in addressing the gang problem. She was intimidating and loud and would confront gang leaders and tell them to leave her son alone. Michelle Bostick, a resident of the area recalled that while the gang leaders did not physically force

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

you to join, if you did not belong to a group or a gang your chance of getting beaten up increased tenfold. Denise looked to others who she thought could provide mentoring, and thus she entrusted Dwayne to the Starrett Boxing Gym. The boxing gym was regarded as an alternative to the gangs in the community. According to Andre Rozier, he enrolled Dwayne at the boxing gym.

Andre said that Dwayne was about age thirteen when gangs started recruiting him. Andre also reported that gangs tried to recruit his biological nephew, Curtis Stevens. According to Andre, the community changed drastically with the introduction of crack. He pointed out that gangs became very prevalent in the area and the gangs tried to recruit kids from a young age. He stated that every boy in the community was at risk of gang recruitment. He said also that it was dangerous to resist affiliation with a gang, as boys and men were forced to form or join a group for protection. He suggested that just to walk one block could be dangerous, because the community had so much violence. Melvin Beverly, a preacher at the Little Rock Baptist Church, also spoke of the problems in the community and reported that his own son was killed by gang violence.

While Andre credited Denise with seeing what was happening to Dwayne, he said he was the one who steered Dwayne and Curtis in another direction. He added that, through the boxing program at the gym, he was able to keep Dwayne and Curtis out of trouble.

Dwayne confirms that the gym played a vital role in keeping him out of trouble. At the gym, he found a structured program that embraced him and offered him an alternative to the streets. He saw boxing as an achievable goal. This was important to him because academic learning was not his strength. School Records indicate that Dwayne had learning problems throughout high school and did not fulfill requirements for a high school diploma.

Dwayne also received counsel from his imprisoned father, who no longer wanted Dwayne to be like him. Stone Sr. stated that he had a conversation with Dwayne and

16

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

impressed upon him to "go straight." He recalled having that conversation when Dwayne was in his late teens. According to Stone Sr., he wanted Dwayne to forget everything that he (Stone Sr.) taught him. Stone Sr. expressed regret for being a poor parent and a bad influence on his son. He said that he is to blame for Dwayne's problems. Stone Sr.'s said that, following the counsel he gave Dwayne, he learned that Dwayne had turned his back on the streets. He said he heard that Dwayne was into boxing and music, and was also a family man.

### Fatherhood

Dwayne has emphasized that he was not into the streets like his father. He reported that, especially since 2003, he has focused on being a family man. In January 2003, Divine Anthony Stone was born to Dwayne and Christina Settle. Dwayne indicated that the birth of his son was a blessing, which motivated him to focus on living for his son. He reported that he enjoyed a close bond with his son, Divine, and that it became very important for him to stay alive so that he could ensure the welfare of his son.

Christina Settle, the mother of Dwayne's son, stated that Dwayne has been a loving and caring father. She remarked that Divine contributed to an obvious change in Dwayne's life. Prior to Divine's birth, according to Christina, Dwayne would keep company with the "wrong crowd." However, she noticed that following Divine's birth, Dwayne stopped hanging out on the streets and, instead, became focused on being a good father. She said that Dwayne took his son with him wherever he went. She recalled that if she called Dwayne in the middle on the night and said that his son needed pampers or milk, he would bring it to her. Dwayne's expressed fear of separation from his son, and that he lived for his son. He reported that he wanted to give his son a better life than he had received from his parents.

### Social Adjustment

Friends and associates reported that Dwayne's demeanor was not that of a thug or

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

murderer. They were struck by his non-aggressive approach and non-confrontational manner. Jimmy O, the boxing gym owner referred to earlier, suggested that Dwayne could not even muster enough aggression to be successful as a boxer. Jimmy O commented that boxing is an aggressive and violent sport, and it is not for everyone. He said that Dwayne lost his first fight, and showed gradual improvement, but Dwayne stopped boxing after two years.

After Dwayne stopped boxing, he was hired by Curtis Stevens as a manager. Curtis reported that he paid Dwayne $600 every two weeks. He said that Dwayne was responsible for his training schedule and to ensure that he was on time for appointments. These appointments included press conferences related to boxing matches. He stated that Dwayne was respected in the community, because Dwayne tried to keep peace. He added that Dwayne did not fear anyone, and no one feared Dwayne. Jimmy O corroborated that Dwayne was a manager for Curtis Stevens, who he described as the gym's star fighter. Jimmy O reiterated that he never knew Dwayne to be a violent person.

Earl Richardson, the current trainer of Curtis Stevens, corroborated that Dwayne was not a violent person. He reported that he never saw Dwayne lose his temper or engage in negative behavior. He confirmed the working relationship that Dwayne had with Curtis and that Curtis paid Dwayne on a fortnightly basis. He added that Dwayne was in the gym everyday. Sadaku Powell, another boxer at the Starret City Boxing Gym, also corroborated the working relationship between Dwayne and Curtis and said that Dwayne was in the gym on an everyday basis. Sadaku also stated that Dwayne was not a violent person and he never saw Dwayne lose his temper.

The above impressions of Dwayne's behavior are in line with what his educational records illustrate. Those records show that Dwayne was not a behavioral problem. One educational evaluation dated November 25, 1991, found that he was below academic functioning; however, it was also noted that he showed "positive interactions with peers and staff in both academic and social environments." Another evaluation

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

done almost seven years later, February 25, 1998, indicated no change in Dwayne's behavior. His attitude was rated "very positive" and his interaction with peers rated as good.

### Education History

Education records show that Dwayne attended the following schools: PS 41K (1987 – 1996), Canarsie High School (1996 – 1999), and Linden Learning Center (1999). Transcripts from these schools show a pattern of absences and academic failure. Reference has already been made to the total number of absences in Dwayne's first four year at PS 41K. By the time he was discharged from Canarsie High School on October 4, 1999, he was averaging 57 absent days per academic year. In his final high school year, Dwayne was performing below average in all subjects.

Dwayne's academic problems caught the attention of teachers at PS 41K when he was nine years old and in the fourth grade. Following a request by his then stepfather, Charles Richardson, he was referred to the Committee on the Handicapped. An educational evaluation report (12/4/91) showed that his reading skills were at the beginning first grade level, and his math skills were at the low to mid third grade level.

As part of a psychological evaluation he was administered the Weschler Intelligence Scale for Children – III (WISC – III) in December 1991. His Full Scale IQ score was 81, which put him in the low average range of intelligence. His Verbal IQ score was 94 (average range) and his Performance IQ score was 70 (borderline range). The evaluator noted that his verbal score reveals high intellectual potential, well within the average range, but difficulties on the performance scale "compromises both intellectual and academic achievement." Following the evaluations, Dwayne was classified Learning Disabled.

Of significance is that Dwayne did not present behavioral problems. This was so although he was noted as having emotional concerns. These included insecurity related to his academic problems, feeling uncomfortable with his little sister after being an only

child for so long, and personality change after the death of his grandfather.    There is no indication that those emotional concerns received attention, especially since Dwayne did not express himself through disruptive behavior.  While Dwayne got along well with peers and adults, he apparently expressed his feelings through withdrawal from school. For Dwayne school was not a comfortable environment, as the stigma associated with being learning disabled was one more emotional burden to bear.  His mother's comments to evaluators (1/16/92) suggest that Dwayne was experiencing frustration, as she voiced concern that his limitations in reading were affecting his feelings toward school and contributing to poor attendance.

His special education records reveal inconsistency in his intellectual functioning. A psychological evaluation (12/6/94) revealed improvement in his WISC – III IQ scores, since his previous evaluation in 1991.    In 1994, his Full Scale IQ score was 93, his Verbal IQ score was 99, and his Performance IQ score was 87.    The results were encouraging, particularly the improvement in his Performance IQ score.    He was rated as in the average range of intelligence in all three scores.  However, in 1998, his scores on the WISC –III reverted to 1991 levels.

Dwayne reported that after his discharge from high school in October 1999, he attended GED classes at Linden Learning Center. He recalled attending Linden for one semester, before withdrawing from the program.    His educational records show that, regardless of the inconsistency in intellectual functioning, his behavior and interaction with others remained consistently good or satisfactory.

**Medical History**

Records received from Kings County Hospital indicate that Dwayne suffered gunshot wound to his right leg on May 18, 2002.  According to the Kings County records, he received treatment for the wound at Brookdale Hospital. The records indicate further that Dwayne subsequently developed infection of the right leg and presented at Kings County Hospital for treatment, which took place during June and July 2002. Dwayne also recalled receiving treatment at Jamaica Hospital, although he was not

certain of the year. Requests were made to Brookdale Hospital and Jamaica Hospital for medical records, but no records were received from these institutions prior to completion of this report.

## Employment History

Dwayne reported that he worked for one year at Victoria Packers, located at 100 Foster Avenue in Brooklyn. He said that his duties included packing meats and spices for delivery to supermarkets. He reported that he worked at the company for minimum wage. He reported that he also worked at a company called Marketeer, where he rolled supermarket flyers. He said that he got paid off the books. Apart from employment with the two companies named, Dwayne reported that he worked as a manager for Curtis Stevens at the Starret City Boxing Gym.

## Discussion of Mitigation

In reviewing Dwayne's social history the following mitigating factors emerge:

- **Maternal Neglect and Abuse**

  Denise acknowledged that she was a neglectful and abusive parent, who had difficulty bonding with Dwayne. This history of neglect and abuse began when Dwayne was still a baby and continued throughout his childhood. Denise's actions and her failure to respond to Dwayne's needs were likely contributing factors to his poor academic functioning, and to his emotional and social problems. The insecurity associated with his mother's relationship to him contributed to alternative attachments that were or could be negative, but which seemed to provide the emotional support that was missing from his mother.

- **Highly Dysfunctional Parents**

  The family backgrounds of Denise Richardson and Stone Sr. reveal unresolved emotional conflicts that impaired their capacity as parents. Neither Denise nor Stone Sr. were prepared emotionally or mentally for parenthood. Denise had been put out of her home by her own mother and Stone Sr. was in the throes of

despair over the death of his mother. Neither was dealing with his/her individual trauma in a positive way. Their attitude and behavior were not conducive to Dwayne's need for a safe and nurturing environment. They created an environment of daily emotional and physical strife, wherein Dwayne's needs became secondary at best and his development put at high risk.

- **Instability in Home**

The lifestyle of both Dwayne's parents contributed to a breakdown of structure and supervision in the home. In Dwayne's early childhood it was never clear who really had custody or supervision of him. This instability was repeated not just in the vulnerable early years of childhood, but also in the pivotal adolescent years when he was most vulnerable to the streets. While his mother tried to shield him from the streets, her failure to provide a nurturing and secure attachment with young Dwayne made him susceptible to the influence of his gangster father and any other who seemed to offer such attachment.

- **Poor Socialization**

Dwayne's socialization was fashioned by the limitations placed upon him by his parents and the community. Both parents have a history of instability and violence, and they began to impress this history upon Dwayne's mind from his early childhood. The community provided little or no alternative to the impressions given by his parents. At age thirteen, faced with the identity crisis of "who am I" Dwayne's choices seemed limited to becoming the gangster his father wanted, and/or becoming a boxer. These choices brought emotional conflict, as they seemed contradictory to a temperament that was not instinctively aggressive or violent. His emotional conflict could easily lead to contradictions in Dwayne's behavior, particularly in a climate where survival often seems to depend on an ability to fight back.

- **Environmental Pressures**

The environmental pressures Dwayne faced came from drugs and gangs. His

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

mother as well as others who live in the community attests to the pervasiveness of drugs and gangs in the community, and the risk of death to boys who resist gang recruitment.    It is difficult to ignore or avoid the influence of that kind of social pressure on a boy's development.    The neglect and abuse Dwayne suffered in the home contributed to his susceptibility to gang recruitment, particularly when the gang is presented as offering kinship and protection.

- **Attachment to Son**

Dwayne has enjoyed a close relationship with his two year old son, Divine Anthony Stone.    His son's mother confirmed that Dwayne has been a responsible father, and reported that Dwayne's incarceration caused trauma for Divine because he was used to seeing his father everyday.   Dwayne has a strong desire to continue a relationship with his son, especially given his concern that a loss of attachment could condemn his son to the same fate as he.

**Conclusion**

Denise Richardson and Stone Sr., Dwayne's parents, blame themselves for Dwayne's current predicament.    Dwayne could not choose his parents anymore than he could choose the environment in which he was born and raised.    The environment mirrored and magnified the instability and violence he witnessed in his own family.  At age thirteen, he was being recruited into one of the many gangs that plague the community. This came in the context of his father's efforts to turn him into a delinquent, while bonding with him, and the eventual trauma of losing his father to the criminal justice system.  It is also noteworthy that his mother failed to provide the nurture and support he needed at critical stages of his development.  At age thirteen, the pressure on Dwayne to join the Folk Nation gang was not just the need for protection, but more so the emotional and social needs for family nurture and identity.   The Folk Nation gang seemed attractive to Dwayne because it appealed to his urgent need for kinship.    As noted in the report, independent sources such as Senator John Sampson, New York State Senator, stated that a lot of the young people in Brownsville join gangs for the purpose of not just protection but also to have a family unit.

**ATTORNEY WORK PRODUCT**
**STONE, Dwayne**

That observation by Senator Sampson, as well as his concern about the desperate need for social, community and economic programs for children of Brownsville indicates the type of pressures that drive young men like Dwayne into gangs.    Dwayne was unfortunately exposed to a culture whereby gangs entered the void caused by the breakdown of stable family life as well as the absence of adequate social and economic opportunities.

Dwayne said that after he was shot, he made a concerted effort to turn his back on the streets.  He indicated that the birth of his son, Divine, was a defining moment in his life as he found fulfillment in being a father.  He recalled that he feared losing his life to violence, and, by extension, he did not want his son to feel threatened by instability and violence.  His mother, friends, and boxing associates attest that he had left the streets and was in the Starret City Boxing Gym everyday, particularly since 2003.   They reported that Dwayne was dedicated to his work as a manager for Curtis Stevens, the boxer who hired him.   They declared that Dwayne was not a man prone to violence and that they never saw him lose his temper.    Their observation corresponds with Dwayne's education records, which show that, despite his academic problems, his attitude and behavior were consistently rated good.   In expressing doubt about the current charge of murder, interviewees point out that such an offense runs contrary to Dwayne's demeanor and character.

Respectfully submitted,

*Carmeta Albarus-Rodney*

Carmeta Albarus-Rodney, LCSW

# Certificate of Completion

## Dwayne Stone

### HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

### PARENTING I

GIVEN AT U.S.P. MCCREARY THE 14TH DAY OF JUNE IN THE YEAR 2012

_R. McCAFFREY_

_G. BOGGS_



# Certificate of Completion

## Dwayne Stone

### HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

## Effective Communication

GIVEN AT U.S.P. McCREARY THE 11TH DAY OF OCTOBER IN THE YEAR 2012

_R. McCaffrey_
R. McCAFFREY

_S. Boggs_
G. BOGGS



# Certificate of Completion

## Dwayne Stone

### HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

### PERSONAL  SUCCESS

GIVEN AT U.S.P. MCCREARY THE 22ND DAY OF OCTOBER IN THE YEAR 2012

R. McCAFFREY

G. BOGGS

# Certificate of Completion

## Dewayne Stone

### HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

## Business Education

GIVEN AT U.S.P. McCREARY THE 18TH DAY OF JULY IN THE YEAR 2013

_____
R. McCAFFREY

_____
G. BOGGS

# Certificate of Completion

## Dewayne Stone

### HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

### ANCIENT EUROPEAN HISTORY

GIVEN AT U.S.P. McCREARY THE 25TH DAY OF JULY IN THE YEAR 2013

_____
R. McCAFFREY

_____
G. BOGGS

# Certificate

# Of Achievement

Is awarded to

## Stone 73058-053

for successful completion of Medical Issues

Wellness Class (24 hours) at

USP, McCreary, Pine Knot, Kentucky

this 11th day of December, 2012

_____
A. Collins, SOR

_____
J. Harris, Rec Specialist, Wellness

UNITED STATES PENITENTIARY MCCREARY

# Certificate of Achievement

## Dwayne Stone

Completion of
Victim Impact Class

August 21, 2012

M. Lawson, Counselor

# Certificate of Completion

## Dwayne Stone

### HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

## Stock Investing

GIVEN AT U.S.P. MCCREARY THE 9TH DAY OF OCTOBER IN THE YEAR 2012

_____
R. McCAFFREY

_____
G. BOGGS

# Certificate of Completion

## DWAYNE ALAN STONE

HAS SUCCESSFULLY COMPLETED THE FOLLOWING ACE COURSE

## REALESTATE

GIVEN AT U.S.P. MCCREARY THE 4TH DAY OF APRIL IN THE YEAR 2010

_M. Casada_
M. CASADA

_G. Boggs_
G. BOGGS, SOE

# Certificate of Achievement

*Awarded to*

*Stone*

*73058-053*

*For Participation In*

*2013 All-Star Basketball Game*

USP McCreary, Fine Knot, KY

August 2013

D Riney
Recreation Specialist

# Certificate of Achievement



Awarded to

## Stone

## 73058-053

For Successfully Winning

Three on Three Basketball Runner-Up

USP McCreary, Pine Knot, KY

July 2013



D. Riney
Recreation Specialist

# Certificate of Achievement



Awarded to

## Stone

## 73058-053

For Successfully Winning

*Three on Three Basketball Championship*

## Unit 5

USP McCreary, Pine Knot, KY

July 2013

D. Riney

Recreation Specialist

# Certificate of Achievement



Awarded to

Stone

73058-058

For Runner-Ups In The

Five on Five Basketball Tournament

USP McCreary, Pine Knot, KY

September 2013

D. Riney
Recreation Specialist

# Certificate of Achievement



## Presented To:

### *D. Stone*



## FOR OUTSTANDING PERFORMANCE/ PARTICIPATION IN THE:
### *"BOSU" - BEGINNERS TONING CLASS*

U.S. Department of Justice  *  Federal Bureau of Prisons  *  U.S.P.  McCreary, K.Y.
Recreation Department - Wellness Program

06-18-10
Date

S. Garcia, Recreation Specialist