

U.S. Department of Justice

United States Attorney
Eastern District of New York

JAJ

271 Cadman Plaza East
Brooklyn, New York 11201

July 25, 2014

**TO BE FILED UNDER SEAL**

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re: United States v. Dwayne Stone
           Criminal Docket No. 05-401 (ILG)

Dear Judge Glasser:

        The government respectfully submits this letter in response to defendant Dwayne Stone's sentencing memorandum dated July 15, 2014. The defendant is scheduled to be resentenced on August 11, 2014.

        The defendant was previously sentenced to, among other penalties, a mandatory term of life imprisonment for the murder of Jamel Washington, a crime that the defendant committed when he was one month shy of his 18th birthday. Because the Supreme Court has recently ruled that a mandatory sentence of life imprisonment without parole is unconstitutional when imposed on an individual who was a juvenile at the time of the murder, the defendant must be resentenced on Count 12 of the superseding indictment.

        Defendant Stone asks the Court to resentence him on each count of conviction, and requests a total sentence of 40 years in prison. For the reasons more fully detailed below, the government does not oppose the defendant's request.

    **I.**    **Background**

        Dwayne Stone was a leader of the violent Folk Nation street gang that operated in the Brownsville neighborhood of Brooklyn, New York from 1998 through 2003. The core members of the group grew up together in the Marcus Garvey and Riverdale Towers housing developments in Brooklyn and began committing crimes with one another at an early age. The members of the gang sold crack cocaine and committed acts of violence, including murder, attempted murder and armed robbery.

Stone was arrested in this case in March 2005, when he was 22 years old.

A. Trial Evidence

In a four-week trial commencing on January 3, 2008, the government called approximately 50 witnesses to describe the conduct set forth below, among them several cooperating witnesses.

1. *The Folk Nation*

The Folk Nation operated in Brownsville from approximately January 1998 until December 2003. There were two subsets of the Folk Nation in the area: the crew operating in the Marcus Garvey Village housing development (the "Black Gangsta Disciples") and the crew operating in the Riverdale Towers housing development (the "Black Gangstas" or "2 7 Folk"). (T 2656-57, 2669).[1]

To signify membership in the Folk Nation, members wore blue, black or grey bandanas hanging from their pockets and sometimes placed bandanas on street signs to signify territory. Graffiti was also used to mark territory in the area. Gang members would "throw up" hand signs to other gang members, including a simulated pitchfork (a Folk Nation signifier) and "BK," for "Blood Killer." Some members, including Stone, had tattoos or brands signifying their gang membership. (T 2657-60, 3740-45).

In order to gain membership in the Folk Nation, an individual had to fight with existing members, a practice known as being "jumped in," in order to demonstrate the toughness required for membership. (T 2667, 3732-33). The first person to fight for entrance into the Black Gangsta Disciples was co-defendant James McTier, and his reward for that action was to become the leader in Marcus Garvey Village. (T 2668, 3363, 3733). Defendant Stone was the leader of the Black Gangsta set of Folk, operating out of Riverdale Towers, a few blocks away from Marcus Garvey Village. (T 2670, 3363).

2. *Narcotics Distribution*

Folk Nation members and associates sold cocaine base ("crack") in the Marcus Garvey Village and Riverdale Towers housing developments, as well as in Wheeling, West Virginia.

Stone, together with co-defendant Sharief Russell, sold crack cocaine from approximately 1998 through 2003, using the apartment of a crack addict as a stash house in Riverdale Towers. (T 2790). They sold crack cocaine in the apartment, and the gang also hid guns there. (T 2791, 3421, 3746-47). The two also traveled back and forth to Wheeling to sell

---

[1] "T" refers to the trial transcript.

crack at prices higher than those obtainable in New York City. (T 2756-57). Witnesses from Wheeling testified that Russell and Stone were his source of crack from New York. (T 3954-56).

       3. *Acts of Violence*

          a. Robbery of Drug Dealers

Members of the Folk Nation occasionally robbed drug dealers. (T 2705). For example, in 2000, Stone and other members of the Folk Nation devised a plan to rob drug dealers in Brooklyn. The group secured a firearm, stormed the drug dealers' apartment, and pistol-whipped and hog-tied the occupants. They left with approximately $2,000 and a quantity of marijuana. (T 2705-08).

          b. Murder of Jamel Washington

The Folk Nation was constantly at war with rival gangs, especially "Anybody Gets It" ("ABG"), an offshoot of the Bloods, following the shooting of James McTier in 2000. One casualty of the war was ABG gang member Jamel Washington, shot in the face and killed by defendant Stone.

On October 6, 2000, Stone and associated gang members Ramel Baker and Rahiem Wyatt stood talking on Bristol Street. Baker walked away and happened upon Washington a short distance away. Not only was Washington a rival gang member, but he also had been in an earlier dispute with Stone at a nearby nightclub. (T 3371).

Knowing that the presence of a rival gang member in Folk Nation territory would be of interest to Stone, Baker returned to Bristol Street and conveyed the information to him. (T 3378). Stone then asked Wyatt for a gun, and Wyatt provided Stone with a .38 caliber revolver. Baker and Stone walked back towards Chester Street, with Baker acting as the lookout, watching for the police. (T 3379-80). Stone and Baker approached Washington, and Stone pulled out his gun and pointed it at Washington's face. (T 3381). When Washington dared Stone to just "go ahead with that" and started to turn away, Stone shot him in the face and several more times in the back as Washington stumbled back into the courtyard. Washington died of his wounds. (T 3382-83).

          c. Attempted Murder of ABG Gang Members

On May 18, 2002, nearly two years after Stone killed Washington, Stone again attempted to kill members of ABG. (T 2756, 3390). This time, Stone was 19 years old and thus no longer a juvenile. While Stone, Baker and others stood in the courtyard at Riverdale, a crack addict told them that ABG members were driving around in a black car. (T 2755, 3387). The group dispersed to obtain guns, but as Baker returned with a gun he heard shots already being fired, and he saw Stone collapse near Riverdale Avenue. (T 2755, 3388-89).

An off-duty police officer was standing in the Riverdale Towers courtyard when he saw two men running down the middle path of the courtyard firing guns, and he recognized

one of them as Dwayne Stone. (T 4114-18). The officer saw Stone drop to the ground near the security booth on Riverdale Avenue. (T 4118-19).

### 4. *Transportation of Stolen Firearms*

In November 2002, two individuals broke into a pawn shop, the Outdoor Retail Store, in Wheeling, and stole 15 to 20 firearms. (T 3982-84). Stone and Russell, who were still dealing crack together in Wheeling, were interested in purchasing the guns, which were worth significantly more in New York City than in Wheeling. (T 3979, 3986-88). Stone purchased several of the weapons, three of which were recovered in New York City in the following months, including one found right outside of Riverdale Towers, where Russell and Stone had been firing guns moments before. (T 3988, 4404-05, 4353).

### B. Conviction and Sentencing

Stone was convicted of murder in-aid-of racketeering (Count 12), racketeering and racketeering conspiracy (Counts One and Two), conspiracy to distribute and possess with intent to distribute cocaine base (Count Three), use of and carrying a firearm during and in relation to a drug trafficking crime and a crime of violence (Counts Four and 13), conspiracy to murder (Count 11), and transportation of stolen firearms (Count 22). In addition to the life imprisonment term on Count Twelve, Stone was sentenced on July 25, 2008 to consecutive terms of five and 25 years (Counts Four and 13) and concurrent terms of 292 months (remaining counts).[1]

### C. Direct Appeal and Petition for Writ of Certiorari

Stone appealed, arguing that this Court improperly denied his motion for a new trial or a hearing based on purported jury misconduct, that the evidence was insufficient to support his convictions, and that his sentences under Section 924(c) were invalid under *United States v. Whitley*, 529 F.3d 150 (2d Cir. 2008), reh'g denied, 540 F.3d 87 (2d Cir. 2009).

The Second Circuit affirmed Stone's convictions by summary order dated December 1, 2009. *United States v. Stone*, 2009WL425532 (2d Cir. December 9, 2009). The Supreme Court denied Stone's petition for a writ of certiorari on June 7, 2010.

---

[1] A total of 292 concurrent months includes the following: 292 months on Counts One, Two and Three; 120 months on Count 11; and 41 months on Count 22. The Judgment erroneously states that Stone was sentenced to life on Count 11, which has a ten year maximum. However, the sentencing transcript correctly indicates that a ten year sentence was imposed on that count.

D.  First Habeas Petition

In 2011, Stone filed a lengthy habeas corpus petition, raising some twenty grounds for relief, most focusing on an alleged ineffective assistance of counsel and claiming actual innocence. This Court observed that the petition was "meritless" and "startling," and accompanied by "blatantly perjurious affidavits." The Court concluded that "Stone is a defendant who has been through all three levels of the federal judicial system. His petition makes a mockery of it and for the reasons stated, his petition must be dismissed." 8/24/2011 Memorandum and Order (11-cv-2763, Docket # 12).

II. **Stone's Second Habeas Petition and the Government's Response**

On June 16, 2013, Stone filed a second 2255 petition pursuant to a June 6, 2013 Mandate from the Second Circuit Court of Appeals, attacking his sentence on the ground that Count Twelve, requiring a life sentence (absent a death sentence), violates the holding in *Miller v. Alabama,* 132 S. Ct. 2455 (2012). The government responded by memorandum dated July 22, 2013, agreeing that Stone should be resentenced.

This Court granted the petition on July 26, 2013 and ordered that the defendant be resentenced. Resentencing is scheduled for August 11, 2014.

III. **Sentencing Argument**

In *Miller,* the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on "'cruel and unusual punishments.'" *Miller*, 132 S. Ct. at 2460. Because of that holding, defendant Stone's sentence on Count 12 must be reconsidered, and this Court must determine, based on all the factors detailed in 18 U.S.C. 3553(a), the appropriate sentence on that count.

The defendant asks the Court to go even further, suggesting that this Court's sentencing of the defendant to 54 years' imprisonment (the sentence imposed in 2008 not accounting for Count 12) would also violate the Eighth Amendment's prohibition of cruel and unusual punishment. The government disagrees with the defendant's premise that a sentence of 54 years would be unconstitutionally excessive, or that a sentence of life imprisonment would be similarly infirm. Indeed, the *Miller* Court expressly refused to consider the argument that a discretionary life sentence could be unconstitutional for a 14-year-old.

But while the government disagrees with the defendant that a discretionary sentence of life imprisonment (or one of 54 years) would be *unconstitutional* in the case of a defendant who was just one month shy of this 18th birthday when he committed murder, the government is not asking the Court to impose such a sentence here. The Court must, as always, fashion a sentence that is sufficient, but not greater than, necessary to satisfy the goals of sentencing, and the government agrees that a combined sentence of 40 years satisfies those goals. In order to accomplish that result, the Court must resentence the defendant entirely, not just on Count 12, due to the 30 years of mandatory minimum sentences required by statute.

5

In determining an appropriate sentence in this case, taking into account the Supreme Court's admonitions in *Miller*, this Court is required to conduct an "individualized sentencing decision," taking into account the defendant's age at the time of the crime and youth's "hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 132 S.Ct. at 2468. The Court must also take into account the defendant's "family and home environment," "peer pressures" and the "possibility of rehabilitation." *Id.*

The government does not dispute that the defendant was 17 at the time of the murder, lacked parental guidance, was subjected to abuse, and was engaged in the deadly cycle of drugs and violence. Those are all factors that the Court must consider in crafting an appropriate sentence.

However, the defendant fails to note other factors that are also relevant to this Court's determination. First and foremost, the defendant fails to acknowledge the seriousness of the crimes of which he was convicted at trial. While the defendant may have been a "juvenile" at the time he gunned down Jamel Washington – he was 17 years and 11 months old – he certainly was not a child as he continued to lead a violent street gang for the next 3 years. After he turned 18, he continued to lead the gang, attempt to kill people, deal crack cocaine and traffic in weapons. These were not the actions of an impetuous child but those of a grown man, and they merit significant punishment. By the time of his arrest, he bore absolutely no resemblance to the two 14-year-olds at issue in *Miller*.

Second, as far as the government is aware, the defendant has shown no remorse for his crimes, and indeed submitted false affidavits to the Court in connection with his first habeas petition. In one of the affidavits Stone falsely swore that he never confessed to Agent Jed Salter that he killed Jamel Washington. The post-trial confession was witnessed by two FBI agents, three federal prosecutors and Stone's own attorney. As Your Honor has noted, the defendant's filings in 2011 made a mockery of the judicial system.

In the end, however, this Court must weigh all of the factors relevant to sentencing, and must determine what sentence is just and fair in light of the fact that the defendant was 17 when he committed murder. He is 31 years old now, having served roughly nine years in prison, and he has, for the most part, been a compliant prisoner.

If the Court sentences the defendant to 30 mandatory years for Counts 4 and 13, consecutive to 10 years on Counts 1-3, 11, and 12 (concurrent with each other and 41 months on Count 22), as he asks the Court to do, the defendant will likely be released in his mid-50s.

The government respectfully submits that such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

        Respectfully submitted,

        LORETTA E. LYNCH
        United States Attorney

By: _____
        Jason A. Jones
        Assistant U.S. Attorney
        (718) 254-7553


cc: Anthony Ricco, Esq.